Robert F. McCauley (SBN 162056)
Robert.mccauley@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Stanford Research Park
3300 Hillview Avenue
Palo Alto, CA 94304-1203
Telephone:  (650) 849-6600
Facsimile:  (650) 849-6666

Vincent P. Kovalick (*Pro Hac Vice*)
Vincent.kovalick@finnegan.com
Barry W. Graham (*Pro Hac Vice*)
Barry.graham@finnegan.com
Richard H. Smith (*Pro Hac Vice*)
Richard.smith@finnegan.com
Troy E. Grabow (*Pro Hac Vice*)
Troy.grabow@finnegan.com
Rajeev Gupta (*Pro Hac Vice*)
Rajeev.gupta@finnegan.com
Kenie Ho (*Pro Hac Vice*)
Kenie.ho@finnegan.com
Cecilia Sanabria (*Pro Hac Vice*)
Cecilia.sanabria@finnegan.com
Jia Lu (*Pro Hac Vice*)
Jia.lu@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

*Attorneys for Linex Technologies, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| LINEX TECHNOLOGIES, INC., | CASE NO. 4:13-cv-00159-CW (MEJ) |
| Plaintiff, | **PLAINTIFF LINEX TECHNOLOGIES INC'S OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | |
| HEWLETT-PACKARD COMPANY,, APPLE COMPUTER INC., ARUBA NETWORKS, INC., MERU NETWORKS, INC. RUCKUS WIRELESS, INC., | **Date: January 23, 2014** **Time: 2:00 p.m.** **Courtroom: 2** **Judge: Hon. Claudia Wilken** |
| Defendants. | |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    DISPUTED TERMS ...........................................................................................3

       A.    Code(s) .....................................................................................................3

             1.    Claim differentiation and the absence of limiting adjectives in the
                   claims precludes Defendants from injecting data bandwidth spreading
                   into the simple term: "code" ...........................................................3

             2.    Defendants' construction fails to cover a well-known category of
                   codes that do not "process data" at all as required by the Defendants'
                   construction ..................................................................................5

             3.    Defendants are improperly attempting to read in a spreading function
                   based on the disclosure of such a function in a preferred embodiment .......5

             4.    Linex's proposed construction is supported by the prosecution history,
                   which makes clear that "code" should not include a data spreading
                   limitation .....................................................................................6

       B.    Spread Spectrum Signals ........................................................................8

             1.    Based on less than a full survey of the evidence, the Texas Court
                   adopted a narrow construction that excluded known forms of spread
                   spectrum ......................................................................................8

             2.    The conflict between the proposed constructions is resolved by
                   answering the underlying questions: (1) whether the signals must be
                   spread only by "code(s)" or also by "coding" techniques, and (2)
                   whether the signals must be limited to user data signals. The answer to
                   (1) is both; and the answer to (2) is no......................................................9

             3.    The extrinsic evidence—replete with examples of multi-carrier spread
                   spectrum systems and systems using coding algorithms—supports
                   Linex's construction on the "coding" issue ............................................10

             4.    The extrinsic evidence also supports Linex's construction on the
                   "data" issue because the evidence provides numerous examples of
                   spread spectrum signals not limited to only "user" data...........................11

       C.    Combining................................................................................................12

             1.    Importantly, Defendants' arguments to narrowly construe "combining"
                   are inapplicable to the claims of the '219 and '812 patents.....................13

             2.    Across all three patents, the express language of the claims is contrary
                   to Defendants' proposed construction ...................................................15

             3.    The varied use of "combining" in the claims is fully supported by the
                   specification .................................................................................16

             4.    The prosecution history of the '322 patent is consistent with the claim
                   language and the teachings of the specification.........................................17

a.      The October 24, 2003, Office Action (Higashi) ...........................18

b.      The December 3, 2003, Office Action (Ono) ...............................19

D.      Combiner circuits/circuitry terms ........................................................20

1.      Ignoring the clear language of the claims, Defendants' construction effectively addresses infringement rather than claim construction by improperly parachuting "separation" limitations into the "combiner circuitry" terms ........................................................................................20

E.      "a plurality of despreading devices for detecting, at each receiver antenna of the plurality of receiving antennas, the first spread-spectrum signal and the second spread-spectrum signal, as a first plurality of detected spread-spectrum signals and a second plurality of detected spread spectrum signals, respectively" ...........................................................................................21

1.      Ignoring simple rules of grammar, Defendants' construction rests on a tortured reading of the claim to require multiple despreaders at each antenna and must be rejected because the phrase "at each receiver antenna" modifies "detecting," not despreaders .........................................22

F.      Separating terms.................................................................................23

1.      Defendants construction, once again, seeks to shoehorn multipath limitations and spreading functions despite the marked absence of either in the claims...............................................................................24

III.     CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,*
  632 F.3d 1246 (Fed. Cir. 2011).................................................................4

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.),*
  687 F.3d 1266 (Fed. Cir. 2012).............................................................6, 16

*Comark Commc'ns, Inc. v. Harris Corp.,*
  156 F.3d 1182, 1186 (Fed. Cir. 1998) ......................................................25

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*
  438 F.3d 1374 (Fed. Cir. 2006)...............................................................24

*Decisioning.com, Inc. v. Federated Dep't Stores, Inc.,*
  527 F.3d 1300 (Fed. Cir. 2008).................................................................6

*Interactive Gift Exp., Inc. v. Compuserve Inc.,*
  256 F.3d 1323 (Fed. Cir. 2001)...............................................................15

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n,*
  690 F.3d 1318 (Fed. Cir. 2012).....................................................4, 6, 12, 25

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
  175 F.3d 985 (Fed. Cir. 1999).................................................................14

*Linex Technologies v. Belkin International, Inc. et al.*
  (the Texas Court) ..............................................................................8

*N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.,*
  215 F.3d 1281 (Fed. Cir. 2000)...............................................................17

*Northrop Grumman Corp. v. Intel Corp.,*
  325 F.3d 1346 (Fed. Cir. 2003)...............................................................18

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005).....................................................3, 12, 15, 20

*Powell v. Home Depot U.S.A., Inc.,*
  663 F.3d 1221 (Fed. Cir. 2011)...............................................................15

*Praxair, Inc. v. ATMI, Inc.,*
  543 F.3d 1306 (Fed. Cir. 2008)...............................................................10

*Spansion, Inc. v. Int'l Trade Comm'n,*
  629 F.3d 1331 (Fed. Cir. 2010)...............................................................20

LINEX'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 4:13-cv-00159-CW  (MEJ)

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..................................................................................7, 18

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2000)..........................................................................................18

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006)..........................................................................................14

**OTHER AUTHORITIES**

Newton's Telecom Dictionary ..............................................................................................8

Code of Federal Regulations, 47 C.F.C. (1996). ................................................................8

Kaled Fazel and Gerhard P. Fettweis, *Multi-Carrier Spread Spectrum*
    (Kluwer Academic Publishers, 1997). ..........................................................................10

Taub and Schilling, *Principles of Communication Systems*,
    (McGraw-Hill, 2nd ed. 1986)............................................................................................1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **I.    INTRODUCTION**

2           The technology at issue relates to digital wireless communication systems developed by one

3    of the pioneers in the field:  Dr. Donald Schilling of Linex Technologies Inc. ("Linex").  His

4    contributions to communications date back to the days of early military applications and have

5    advanced to today's commercial cell phone and WiFi technologies that are now common to us all.

6           Dr. Schilling is a recognized visionary in the field of digital communications with numerous

7    honors and awards.  For over 60 years, he had the foresight to recognize improvements that would

8    make digital communications a ubiquitous part of our daily lives.  His contributions[1] are apparent

9    from his large number of technical publications, more than 150 patents and numerous textbooks,

10   including the widely used textbook that he co-authored, *Principles of Communication Systems*.  Ex.

11   1.[2]  He has also helped train and develop generations of engineers for over 30 years as a professor in

12   the Electrical Engineering Department at the Brooklyn Polytechnic Institute (1962-1969) and the

13   City College of New York (1970-1992).  During his time as a professor, Dr. Schilling co-authored

14   twelve textbooks and more than 200 papers in internationally recognized technical journals.  He

15   advised more than 75 Ph.D. students, many of whom wrote their dissertations on various forms of

16   communications systems.  Ex. 2.

17          For much of his six decades of work in wireless communications, Dr. Schilling has simply

18   been ahead of his time in designing creative, practical solutions for more robust and reliable

19   communications systems. Dr. Schilling's solutions are critical to today's wireless systems, including

20   the commercially successful CDMA, LTE, and WiFi systems. Dr. Schilling founded commercial

21   companies to develop and license his technologies, including the very successful InterDigital

22

23   _____

24   [1] Dr. Schilling has helped numerous governmental agencies develop wireless communication
     systems, including NASA and the U.S. Army.  In addition to his other achievements, Dr. Schilling
25   was the President of the IEEE Communications Society—one of the most prestigious scientific
     organizations in the world in the field of communications.  He was a member of the IEEE Board of
26   Directors and is a Fellow of the IEEE, and he received the Edwin Howard Armstrong Award in 1998
     for his lifetime achievements in wireless communications.  Ex. 2.

27   [2] Citations to the Exhibits in this brief are to exhibits attached to the supporting declaration of Rajeev
28   Gupta.

1    Communications Inc., where he served as Executive Vice President, Vice Chairman of the Board,

2    and then as CEO, and which continues to license many of his inventions to this day.

3         This case concerns Dr. Schilling's '322, '219, and '812 patents ("the patents-in-suit"), which

4    describe and claim aspects of a communications system that use multiple antennas at both a

5    transmitter and a receiver to improve the capacity or "speed" of the communications.  In the late

6    1990s, after forming Linex, Dr. Schilling conceived a novel way to reduce the effects of distortion

7    and noise on a transmitted signal caused by interference from objects and other wave sources in the

8    path from the transmitter to a receiver.  By analogy, as the Court can appreciate that when

9    one throws a pebble into a still pond, one can observe the resulting waves spreading out

10   uniformly and uninterrupted until they run out of energy.  But, throw a handful of pebbles into a

11   rocky stream and one can barely notice the resulting waves.  They exist, but they are difficult to

12   detect due to interference from waves reflected off the rocks and currents from other objects.

13        The analogy applies to wireless communications.  The air path (this is the "channel") from a

14   transmitter (for example, the WiFi box in your home) to a receiver (for example, your laptop) is not

15   like a still pond.  Rather, the channel includes walls, ceilings, floors, and possibly other transmitting

16   objects, which project and reflect waves in all directions.  These bouncing waves interfere with each

17   other and cause distortions to the original signal.  In other words, the channel is said to be "noisy,"

18   and the extraction of an original transmitted signal from such a noisy wireless channel is a

19   particularly arduous task.  The more data being transmitted, i.e., the "faster" the transmission, the

20   harder the task.

21        Dr. Schilling's inventions help solve this complicated problem.  His system uses multiple

22   antennas at both the transmitter and receiver—also known as "multiple-input and multiple-output" or

23   "MIMO."  The system uses processing circuits that split (or demultiplex) the input data stream and

24   transmit portions of it on separate, parallel signals all at the same time.  The receiver includes

25   multiple antennas and processing circuits that can extract the data from the multiple, noisy

26   transmissions and put it back together in an ordered way to reconstruct the original transmitted

27   signal.  A feature of Dr. Schilling's invention involves coding the transmitted streams with different

28   codes to allow the transmitted streams to be distinguished at each of the receiver systems so that the

separate streams can be recovered and merged back into a single stream.  Dr. Schilling's invention has revolutionized the wireless communications industry and resulted in the pervasiveness of the current and next generations of wireless communications.

As to the task at hand, i.e., claim construction, the disputed claim terms are clear and require little, if any, further construction or rephrasing.  Contrary to well-established principles, Defendants urge a rewriting of the claims that improperly imports technical details of the preferred embodiments and imposes artificial limitations based simply on statements made in discussions with the P.T.O., which Defendants chose to misinterpret.  Defendants' proposed constructions are no more than a blatant attempt to manufacture a noninfringement position under the guise of claim construction.

## II.     DISPUTED TERMS

### A.     Code(s)[3]

| Linex's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a predetermined sequence(s) of bits or symbols | a predetermined sequence(s) used to process data to spread the data's bandwidth |

Linex disagrees that the word "code(s)" needs construing because it requires "little more than the application of the widely accepted meaning of commonly understood words."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).  To the extent a construction is necessary, "code(s)" should be construed as the term is used in the claims and the specification, and as it would be commonly understood by one of ordinary skill in the art at the time of the invention—to mean "a predetermined sequence(s) of bits or symbols."

### 1.     Claim differentiation and the absence of limiting adjectives in the claims precludes Defendants from injecting data bandwidth spreading into the simple term: "code"

In the claims, the term "code" includes no limiting adjectives or descriptors.  Thus, Defendants simply wish to add limitations as a basis for noninfringement.  However, legal precedent

---

[3] The word "code(s)" appears in asserted claims 97, 108, 109, 120, 121, 132, 133, and 145 of the '219 patent (Ex. 3) and asserted claims 97, 101, and 106 of the '812 patent (Ex. 4).  The term "code" is not recited in the asserted claims of the '322 patent.

LINEX'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 4:13-cv-00159-CW  (MEJ)

1    does not allow this.  As used in the claim, the term code simply refers to a code that identifies and

2    distinguishes one antenna from another, not a code that is "used to process data to spread the data's

3    bandwidth" as Defendants propose in their construction.  Indeed, faced with a similar question, the

4    Federal Circuit has recently confirmed that "the plain meaning of 'code' to one of skill in the

5    cellphone communications art is a sequence of bits . . .  or chips . . . broad enough to cover both a

6    spreading code and a non-spreading code."  *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690

7    F.3d 1318, 1324 (Fed. Cir. 2012).  Here, the asserted claims do not set forth or suggest a deviation

8    from the "nonrestrictive nature of the ordinary meaning of the claim term 'code.'"  *Id.*

9            More specifically, in *InterDigital*, the Federal Circuit applied claim differentiation to find

10   that spreading limitations appearing in other claim terms should not be read into the claim term

11   "code" itself.  *Id*. at 1324-25.  Here, just as in *InterDigital*, reference to other claims confirms that

12   the limitation of spreading should not be read into the term code itself.  Most notably, dependent

13   claims 114, 118, and 124 of the '812 patent all specify that the recited codes are spreading codes.

14   For example, claim 114 recites, "The receiver system of claim 97 wherein said different codes

15   conveyed along with said signals are spreading codes."  Ex. 4 at 30:56-57.  *See InterDigital*, 690

16   F.3d at 1324 ("The doctrine of claim differentiation is at its strongest in this type of case, 'where the

17   limitation that is sought to be 'read into' an independent claim already appears in a dependent

18   claim.'") (citations omitted).  Just as in *InterDigital*, "[t]he logic of the situation is as powerful as it

19   is simple," in that "[i]f the claim drafter had intended to limit [the independent claim] to spreading

20   codes . . .  it would have been much simpler for the drafter to explicitly recite the 'spreading code'

21   limitation in [the independent claim] and omit [the dependent claim] altogether." *Id*. at 1325.

22           In the '219 patent, reference to other claims also shows that a restrictive definition of code is

23   not intended.  Claims 97 and 109 of the '219 patent do not call for a "spread spectrum" system or

24   method.  Claims 121 and 133 are similar to claims 97 and 109, respectively, but recite "spread

25   spectrum."  Ex. 3.  Defendants' proposed construction would render claims 97 and 109 superfluous

26   by reading the "spread spectrum" limitations of claims 121 and 133 into the claims that do not

27   contain such recitations.  *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246,

28   1254-55 (Fed. Cir. 2011).

2. **Defendants' construction fails to cover a well-known category of codes that do not "process data" at all as required by the Defendants' construction**

As discussed above, the plain and ordinary meaning of the term "code" covers codes that spread the data's bandwidth and codes that do not. It is also broad enough to encompass codes that do not process data at all. Numerous authorities on spread spectrum systems explain the need for codes that do not process data, including preamble codes and pilot codes. *See, e.g.*, Ex. 6, Ono '560 at 6:2-10 (describing the use of a pilot symbol or a preamble symbol for channel estimation in a spread spectrum system having a RAKE receiver); Ex. 7, Schilling '951 at 4:42-5:5 (describing derivation of bit synchronization from a "generic-chip-code signal"); Ex. 8, Gilhousen '459 at 5:55-62 (describing the use of spread spectrum modulated signals such as cell-site identification, system timing, paging information and other control signals in a CDMA system); and Ex. 9, Kotzin '005 at 16:12-30 (describing different pilot codes used to differentiate different transmitted streams in a spread spectrum system using a RAKE receiver).[4] Prucnal Decl., ¶ 60. Defendants' proposed construction is flawed in that it limits the codes to those that increase the bandwidth of data, and also excludes these well-known categories of codes that do not "process data" at all. *Id*. at ¶ 66.

3. **Defendants are improperly attempting to read in a spreading function based on the disclosure of such a function in a preferred embodiment**

The specification uses "code" broadly without any descriptors to limit its functionality (e.g., Ex. 3, '219 patent, 1:27-31 (describing the invention as using "space diversity and coding" in the BACKGROUND OF THE INVENTION); 4:14-19 (describing the Figures as "having two codes and two antennas")), and depicts codes represented by chip-sequence signals in the preferred embodiment. Prucnal Decl., ¶ 56.

Defendants, however, improperly urge importing limitations from certain embodiments of the specification into the claims. Defendants argue that the specification discloses embodiments that use "chip-sequence-signals" as the code, and that one of the functions of the disclosed chip-sequence

---

[4] The Ono '560, Schilling '951, and Kotzin '005 patents are cited in the prosecution histories of the '219 and '812 patents, and as such are intrinsic evidence. *See, e.g.*, Ex. 3, page 2; Ex. 4, page 2.

signals is to process the data to generate spread-spectrum signals.  Ex. 43, ¶¶ 352-53.  In the

preferred embodiment of the '219 and '812 patent, codes are used to perform two functions: (1)

differentiate the signals transmitted from different antennas; and (2) perform direct sequence spread

spectrum processing.  Defendants seek to import both functions from the preferred embodiment into

the asserted claims, even though only the former is expressly recited in the claims.  It is axiomatic

that limitations from the preferred embodiments cannot be imported into the claims.  *See*

*Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1310, 1314 (Fed. Cir. 2008);

*see also InterDigital*, 690 F.3d at 1325.

    **4.**    **Linex's proposed construction is supported by the prosecution history, which makes clear that "code" should not include a data spreading limitation**

During the prosecution of the '219 patent, the Examiner cited U.S. Patent No. 6,353,626 (the

'626 patent") (Ex. 10), pointing to the PN spreaders 52 as showing the claimed "spread-spectrum

arrangement."  Ex. 11 at LNXITC00000056-57.  The PN code of the '626 patent is the type that

does not increase the bandwidth of the signal.  By pointing to codes that do not increase the

bandwidth of data, the Examiner recognized what was well known in the art, namely, that codes for

spread spectrum processing need not actually increase the bandwidth.  Prucnal Decl., ¶ 41.

Additional references cited during prosecution also disclose codes, like the claimed codes, that are

not used to process user data or spread the bandwidth of the data.  *Id.* at ¶ 60.

With respect to the '812 patent, Linex specifically informed the Examiner that the term

"codes" are not limited to codes used only in spread spectrum or codes that increase the bandwidth

of the signals that are conveyed along with the codes.  Ex. 40 at LNXCAL00072433.  Linex also

pointed out—to support the broader breadth of the independent claims—that the dependent claims

recited that the codes are spreading codes.  *Id.*  As such, claim differentiation controls.  *See Bancorp*

*Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1275 (Fed. Cir. 2012).

Defendants allege that certain statements made during the prosecution of the '219 patent

application resulted in a disclaimer that should limit the term "code" to codes that spread bandwidth.

The first statement Defendants point to relates to an amendment to the specification to insert the

1   phrase "the code represented by" (which appears in the '219 patent, Ex. 3 at 5:29), where the

2   applicant clarified that "[t]his submission includes an amendment to the specification to include the

3   words 'the code represented by' which is inherent in spread spectrum processing . . . ." Ex. 12 at

4   LNXITC00001351. Ex. 43, ¶ 358. This statement, however, merely provides exemplary support for

5   the word "code" by pointing out that chip-sequence signals can be used in spread spectrum

6   processing and can be represented by codes. It does not state that the claimed "codes" are limited to

7   only those that are used to spread the data's bandwidth. At the very least, the statement does not rise

8   to the level of a "clear and unmistakable disclaimer" required to limit the scope of the claim

9   language. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012)

10  (explaining that "[t]he standard for disavowal is . . . exacting," and "[t]o constitute disclaimer, there

11  must be a clear and unmistakable disclaimer."). The insignificance of this statement with respect to

12  the scope of the claim is also made apparent with reference to the relevant art because, as discussed

13  above, it was well understood by those of ordinary skill that a number of codes were known that do

14  not necessarily spread the data's bandwidth. Prucnal Decl., ¶¶ 60, 63.

15          Defendants also point to a statement in the prosecution history of the '219 application,

16  explaining that "[b]roadening results from adding new claims reciting 'spread spectrum' broadly . . .

17  <u>and</u> from adding new claims . . . for processing received signals containing codes indicating

18  transmission of the signals from different transmitting antennas." Ex. 13 at LNXITC00001508

19  (emphasis added). Ex. 43, ¶¶ 358, 364. Consistent with the claimed function of the claimed

20  "codes," this statement merely explains that new claims were added reciting codes for differentiating

21  signals from different transmitting antennas. On its face, the part of the statement regarding the

22  intent to broadly claim "spread spectrum" applies to the claims that actually recite "spread

23  spectrum," e.g., new claims 121 and 133 of the '219 patent. Whereas, the claims not reciting

24  "spread spectrum," e.g., claim 97 of the '219 patent, were not intended to be limited to spread

25  spectrum. That is precisely the point of including claims directed to different features of an invention

26  in a patent application, a common practice amongst all practitioners.

27

28

7

### B.    Spread Spectrum Signals[5]

| Linex's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| signals processed with one or more forms of coding that increases the bandwidth and distributes each signal across the available bandwidth | signals corresponding to data which has been processed with one or more codes that distributes and increases the bandwidth of the data across the available bandwidth |

While the proposed constructions appear similar, the subtle differences are critical.  A full and complete review of the intrinsic and extrinsic evidence shows that Linex's proposed construction accurately expresses the proper scope of the claim term.  Defendants' construction is flawed at least because: (1) it unduly limits spread spectrum signals to those that are processed by "codes," and not "coding"; and (2) it improperly encompasses only signals corresponding to "user data," as the Defendants limit their term "data."  To support of their arguments, Defendants rely on a claim construction decision by the court in *Linex Technologies v. Belkin International, Inc. et al.* (the Texas Court), where the phrase "plurality of spread-spectrum signals" from the claims of the '322 patent was construed as "a plurality of signals processed with one or more codes that distributes each signal across the available bandwidth."  Ex. 14 at LNXITC00020625.  However, as discussed below, Defendants' reliance on that decision is misplaced.

### 1.    Based on less than a full survey of the evidence, the Texas Court adopted a narrow construction that excluded known forms of spread spectrum

The Texas Court arrived at that construction by first reviewing the intrinsic evidence and concluding, based on the repeated and differing uses of the term "spread spectrum" in the specification and claims of the '322 patent, that the term "spread spectrum was well-known in the art at the time the patent application was filed."  *Id.* at LNXITC00020621.  However, the term is not actually defined in the '322 patent.

So, the Texas Court looked to extrinsic evidence—particularly five references: (1) the "Schilling Tutorial" (Ex. 15); (2) the Code of Federal Regulations, 47 C.F.C. § 2.1 (1996); (3)

---

[5] The term "spread spectrum signals" appears in asserted claim 9 of the '322 patent, asserted claims 121 and 133 of the '219 patent, and asserted claim 101 of the '812 patent.

Newton's Telecom Dictionary (Ex. 17); (4) Schilling patent 5,081,643 (Ex. 18); and (5) Schilling patent 5,422,908 (Ex. 19). From this, the Texas Court concluded that "spread spectrum signals" included three types: direct sequence (DS), frequency-hopping (FH), and time-hopping (TH).

Although the Texas Court correctly consulted extrinsic evidence, its scope was limited because several other types of spread spectrum signals were well known, but were not brought to the court's attention.[6] As discussed below, a more representative collection of prior art shows that Linex's proposed construction corresponds with a more complete understanding of spread spectrum signals by a person of ordinary skill in the art.

> **2.    The conflict between the proposed constructions is resolved by answering the underlying questions: (1) whether the signals must be spread only by "code(s)" or also by "coding" techniques, and (2) whether the signals must be limited to user data signals. The answer to (1) is both; and the answer to (2) is no.**

With respect to the first issue, the intrinsic evidence is clear that "spreading" can be accomplished by either "coding" techniques or by "codes." Indeed, the specification refers to "coding" in at least four places. Ex. 3, 1:31 (describing the invention as using "space diversity and coding" in the BACKGROUND OF THE INVENTION); 2:3; 4:47-48; 12:16-28. Similarly, the specification also describes "code[s]" that are represented by chip-sequence signals in the preferred embodiment for spreading the bandwidth. *See* Ex. 3, 4:14-19 (describing the Figures as "having two codes and two antennas")). Prucnal Decl., ¶ 56.

As to the "user data" issue, in the Detailed Description of the Preferred Embodiments, the specification states generically that spread-spectrum processing "*typically* includes multiplying the plurality of subchannels of *data* by the plurality of chip-sequence signals, respectively." Ex. 3, 7:50-52 (emphasis added). Not only does this passage describe the system generically, but it uses the well understood term "typically." Therefore, it is wrong for Defendants to refer to this discussion to limit "data" to only "user data" because it is especially improper to import limitations of disclosed embodiments into the claims where the word "typically" is used to describe this aspect of the

---

[6] At that time, Linex was represented by different counsel.

1    embodiment. *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1323 (Fed. Cir. 2008) (refusing to

2    limit claim based on disclosed embodiment, reasoning that the word "typically" implies that "the

3    passage describes only the most common embodiment rather than the full scope of the invention.")

4    Indeed, far from a limiting remark, the patentee explicitly clarified his intent to claim "spread

5    spectrum" "broadly to cover spread spectrum processing of all types within the conventional

6    meaning of 'spread spectrum'. . . ." Exs. 13, 20 (reissue declarations).

### 3. The extrinsic evidence—replete with examples of multi-carrier spread spectrum systems and systems using coding algorithms— supports Linex's construction on the "coding" issue

9        A review of the extrinsic evidence shows that the Texas Court was uninformed about at least

10   two other forms of spread spectrum techniques known in the art:  (1) multi-carrier spread spectrum,

11   and (2) spread spectrum using a coding algorithm.  Regarding the first point, "multi-carrier" spread

12   spectrum (MC-SS) is described, e.g., in a 1997 book entitled "Multi-Carrier Spread Spectrum."  Ex.

13   25 at LNXCAL00072907.  MCSS uses OFDM (Orthogonal Frequency Division Multiplexing)

14   modulation, which is the same modulation scheme used in Defendants' accused products.  MC-SS

15   and OFDM employ a type of coding based on an IDFT (Inverse Discrete Fourier Transform) or IFFT

16   (Inverse Fast Fourier Transform) coding algorithm to distribute the signal across the available

17   bandwidth.  Other such coding algorithms are described in a number of other extrinsic references

18   contemporaneous with the 1998 priority date of the patents-in-suit.  Prucnal Decl., ¶ 72.  *See, e.g.*,

19   Ex. 28 at LNXCAL00079442-43, Ex. 29 at LNXCAL00072930, Ex. 30 at LNXCAL00073096, Ex.

20   31 at LNXITC00063185, and Ex. 32 at LNXITC00042172-73, 79.

21       Regarding the second point, many other spread spectrum systems that use a coding algorithm

22   were also well known at the time of the invention.  For example, the IEEE 802.11 Standard

23   recognizes "coding algorithm" types of spread spectrum called "CCK" and "PBCC."  Prucnal Decl.,

24   ¶ 71.  Further, spread spectrum using error correction "coding" was described in 1990 by Andrew

25   Viterbi—one of the co-founders of Qualcomm, Inc.[7]  Ex. 21.  Viterbi describes this technique, where

---

[7] Qualcomm-Atheros is a supplier of WiFi chips to one or more Defendants.

1    the bandwidth increase is due entirely to the error coding algorithm (*i.e.*, processing), not a code

2    (*i.e.*, a sequence of bits or symbols).  *Id.* at LNXCAL00072840.  Other extrinsic evidence, including

3    papers by Frenger (Ex. 22), Rikkinen (Ex. 23), and Ormondroyd (Ex. 24), describe similar spread

4    spectrum systems whereby a coding algorithm—not a code—is used to create a spread spectrum

5    signal.  Prucnal Decl., ¶¶ 69, 70.

6            In sum, the Texas Court unfortunately adopted an overly narrow construction of the term

7    "spread spectrum" that excluded spread spectrum signals known in the art, such as spread spectrum

8    systems using error-coding algorithms and multi-carrier spread spectrum systems using an IFFT

9    coding algorithm.  Considering these known spread spectrum coding techniques, the Texas Court's

10   construction is too narrow because it limits spread spectrum signals to only those spread by codes,

11   and not also by coding.  Today, a more complete and more informed analysis reveals that a proper

12   construction includes spread spectrum signals produced by both codes and coding algorithms.

13               **4.      The extrinsic evidence also supports Linex's construction on the**
                          **"data" issue because the evidence provides numerous examples of**
14                        **spread spectrum signals not limited to only "user" data**

15          First, the Texas Court did not include a "data" limitation in its construction of spread

16   spectrum signals.[8]  Second, a number of references, including Dr. Schilling's U.S. Patent No.

17   5,166,951, make clear that the meaning of spread spectrum signals, at the time the patent was filed,

18   encompassed spread spectrum signals that did not correspond to only user data.  Prucnal Decl.,

19   ¶¶ 60-62.  Dr. Schilling's own tutorial paper from 1982 (the "Schilling Tutorial"), which the Texas

20   Court relied on, actually describes spread spectrum signals that include both synchronization codes

21   as well as user data.  Ex. 15 at LNXITC00036010.  The Schilling Tutorial explains that "[i]n many

22   practical systems no data are transmitted for a specified time sufficiently long to ensure that

23   acquisition has occurred."  *Id.*  The Texas Court obviously did not appreciate the scope of this

24   teaching.  But, looking at the specification of the asserted patents, a person skilled in the art would

25   understand that the disclosed embodiment is operated in a synchronized state, and thus

26

27   [8] The Texas Court construed "spread spectrum signals" as "signals processed with one or more
     codes that distribute each signal across the available bandwidth."  Ex. 14 at LNXICT00020625.
28

LINEX'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 4:13-cv-00159-CW  (MEJ)

synchronization codes have to be transmitted before the user data to achieve synchronization. Prucnal Decl., ¶ 63. Thus, the patent specification is not limited to spreading only user data, as Defendants suggest.

The Federal Circuit also recognized in *InterDigital* that synchronization codes disclosed in the specification of the patent-at-issue in that case were referred to as "pilot codes"—which are also not "user data." *InterDigital*, 690 F.3d at 1322, 1326. Numerous other references describe spread spectrum signals that do not correspond to only "user data." *See, e.g.*, Ex. 33 at 4:6-10 (describing transmitted control data); Ex. 34 at 6:2-12 (transmitted pilot data); Ex. 8 (describing spread spectrum modulated control signals). Prucnal Decl., ¶ 60.

Accordingly, Defendants' proposed construction, which limits spread spectrum signals to (1) signals produced by "codes," and (2) that carry only "user data," is unduly narrow because it frames the issue as noninfringement, not claim construction. Defendants' construction must be rejected because it excludes spread spectrum signals produced by "coding" or that carry control data such as synchronization, timing, training, and pilot symbols. Linex's construction properly encompasses the scope of the term as known in the art as of 1998.

## C.    Combining[9]

| Linex's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| aggregating | aggregating space- and time-diverse signals |

Linex disagrees that the word "combining" requires any construction because it is a common verb with a well-understood meaning.[10] *See Phillips*, 415 F.3d at 1314. To the extent construction is necessary, "combining" should be construed as the term is used in everyday parlance, the claims, the specification, and as it would be commonly understood by one of ordinary skill in the art at the

---

[9] The word "combining" appears in asserted claim 9 of the '322 patent, asserted claims 97, 109, 121 and 133 of the '219 patent, and asserted claims 98 and 102 of the '812 patent. It does not appear in claim 97 of the '812 patent.

[10] *See* Ex. 64 at 25 (defining "aggregate," including the verb form "aggregating," as "adj. 1. formed by the conjunction or collection of particulars into a whole mass or sum; total; combined.").

time of the invention—to mean "aggregating."

The claims of all three asserted patents use the term "combining" broadly and generically, unless otherwise specified in specific claims. Defendants' proposed construction adds the "space- and time-diverse signals"[11] limitation—which simply does not exist in the claim language—to the claim term "combining" across all three asserted patents based on the prosecution history of the '322 patent. This, of course, is legally wrong and is obviously a shot at noninfringement disguised as claim construction.

The table below demonstrates the differences in the use of the word "combining" in asserted claims of the '322, '219, and '812 patents.

| '322, Claim 9 | "A system for receiving data symbols . . . with the plurality of spread-spectrum signals passing through a **communications channel having multipath** . . . comprising: . . . a **plurality of combiners** for combining, from each receiver antenna of the plurality of receiver antennas, each of the first plurality of detected spread-spectrum signals . . . ." |
| --- | --- |
| '219, Claim 97 | "A receiver system for recovering data conveyed in data symbols by a plurality of different signals transmitted on separate carrier waves from a single source over a wireless channel . . . comprising: . . . **combiner circuits for combining received data symbols transmitted in signals with the same code and received by different receiving antennas** . . . ." |
| '812, Claim 98 | "The receiver system of claim 97 further comprising **space diversity combiner circuitry** for combining signals received on said different receiving antennas . . . ." |

Before addressing the merits of Defendants' disclaimer argument based on the prosecution history of the '322 patent, Linex will address the legal effect of any such disclaimer as it relates to the '219 and '812 reissue patents.

       **1.** **Importantly, Defendants' arguments to narrowly construe "combining" are inapplicable to the claims of the '219 and '812 patents**

---

[11] "Space-diverse signals" and "space-diversity" result from having plural transmit antennas and receive antennas. "Time-diverse signals" and "time-diversity" result from signals arriving at different times because they follow different paths in a "multipath" channel. Combining time-diverse signals detected at <u>one</u> antenna is called "RAKE" combining, "single-antenna" RAKE, or "single-antenna" time diversity. Prucnal Decl., ¶ 85. It appears that Defendants may be interpreting aggregating "time-diverse signals" in their proposed construction to be synonymous with RAKE combining. Linex disagrees with such an interpretation, and reserves the right to address Defendants' interpretation in its Reply brief, should Defendants pursue such a litigation-driven interpretation of its construction.

1      Defendants argue that if a disclaimer exists for the claims of the '322 patent, it should

2  extend to the terms of the '219 and '812 patents.  However, disclaimer does not extend from a

3  parent application to terms in a child application where the claim terms in the descendant patent

4  use different language.  *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed.

5  Cir. 2006) ("the doctrine of prosecution disclaimer generally does not apply when the claim term

6  in the descendant patent uses different language.").  The language of the '219 patent claims differs

7  significantly from the claim language of the '322 patent.  Claim 9 of the '322 patent recites "a

8  plurality of combiners," whereas claim 97 of the '219 patent recites "combiner circuits for

9  combining received data symbols transmitted in signals with the same code and received by

10  different receiving antennas."  The "combiner circuits" of the '219 patent clearly recite that only

11  data symbols received by different antennas are combined, which, as understood by one of

12  ordinary skill, does not implicate combining of any "time-diverse" signals.  Prucnal Decl., ¶ 80.

13  Simply put, there is not even a hook in the claim language of claim 97 of the '219 patent to bring

14  in time diversity combining.  *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990

15  (Fed. Cir. 1999) ("there must be a textual reference in the actual language of the claim with which

16  to associate a proffered claim construction").

17      Also, in contrast to claim 9 of the '322 patent, the claims of the '219 patent do not mention

18  "multipath."  This difference is significant to one of ordinary skill because the "multipath"

19  recitation implies time-diverse signals.  Prucnal Decl., ¶ 80.  Indeed, the claims of the '219 patent

20  were specifically drafted to remove reference to "multipath" from the claims, thereby removing

21  any doubt that the "combiner circuits" of the '219 patent do not require time diversity combining.

22  *Id.* at ¶ 94.  Thus, imposing a requirement of time-diversity combining, or any other combining of

23  time diverse signals, into the independent claims of the '219 patent would be inconsistent with the

24  claim language.

25      Further, the '219 and '812 patents resulted from reissue applications filed to broadly claim a

26  system covering the use of codes to distinguish signals sent from different antennas in both spread

27  spectrum systems and non-spread-spectrum systems.  The accompanying reissue declarations

28  confirm that the purpose of the reissue application was to correct errors of claiming less than the

patentee had a right to claim by broadening the scope of the claims. Exs. 12, 20. In doing so, the reissue claims were broadened to ensure that they covered systems unaffected by multipath, as well as systems affected by multipath, but in a different way from that previously claimed.

The differences in claim language between the '322 patent and the '812 patent are even clearer. First, the claims of the '812 patent expressly omit any references to "multipath." Second, the combiner circuitry in '812 claim 98 is explicitly referred to as "*space diversity* combiner circuitry," which again, expressly excludes "time diversity" combiner circuits. Ex. 4 at 28:2 (emphasis added). As such, Defendants' proposed construction is improper because it is contrary to the plain language of the claims and imposes a different, additional limitation (time diversity combining), when another specific type of combining (space diversity combining) is already set forth in the claim.

### 2. Across all three patents, the express language of the claims is contrary to Defendants' proposed construction

In claim construction, "the analytical focus must begin and remain centered on the language of the claims themselves[.]" *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In particular, "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. In construing "combining," there is no need to look beyond the claim language itself for any of the patents. Throughout the claims, the word combining is used consistently with its ordinary meaning. Most significantly, in the patents-in-suit, the word "combining" immediately precedes the values or signals that are to be combined. For example, claim 97 of the '219 patent recites "combining received data symbols transmitted in signals with the same code and received by different receiving antennas . . . ." Ex. 3, 28:15-17 (emphasis added).

By their proposed construction, Defendants appear to agree that the verb "combining" has an ordinary meaning of "aggregating," but they then attempt to shoehorn an additional limitation of *what* is being combined that is expressly contrary to *what* the claims recite as being combined. A patentee is presumed to have intended every word chosen for use in a claim to have a specific function. *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1233 (Fed. Cir. 2011) (rejecting a construction of "table top" that included a function of the table top where the surrounding claim

language dealt with the function of the table top).  Here, the claims themselves define what is to be combined.  Simply put, the entire combining element is not being offered for construction; rather, only the simple verb "combining" is to be construed.  Thus, specifying what is being combined in the construction of the "combining" term, *i.e.*, defendants' additional language of "space- and time-diverse signals," is not necessary and legally wrong.

Defendants' construction must also fail because it is counter to the doctrine of claim differentiation.  For example, dependent claim 109, which depends from asserted dependent claim 98 of the '812 patent, recites:

> The receiver system of claim 98 wherein said combiner circuitry **further includes time-diversity combining** circuitry for combining multipath components of signals conveyed on each of one of said carrier waves.

Ex. 4, 30:37-40 (emphasis added).  Similar differentiation appears in the claims of the '219 patent.  For example, dependent claim 103 recites, "The receiver system of claim 102 wherein said combiners employ RAKE signal combining."  Ex. 3, 28:38-39.  One of ordinary skill understands that since the dependent claim introduces "time-diversity" combining, no such limitation exists in the independent claim.  Prucnal Decl., ¶ 94.  Defendants' proposed construction would render these dependent claims superfluous, demonstrating that their construction is contrary to the plain meaning of the language of the claims.  *See Bancorp Servs., L.L.C.*, 687 F.3d at 1275.

Finally, Defendants' proposed construction abrogates the differences in claim language across the patents.  Each of the asserted independent claims of the patents explicitly sets forth what is being combined by the claimed combiner circuits.  And the claim language across these claims is different.  By insisting on the identical construction of the word "combining" taken in isolation of the remainder of the claim language, Defendants effectively eliminate those recitations and render meaningless the differences in claim language across different claims, even though the P.T.O. approved the varying claim scope.

### 3. The varied use of "combining" in the claims is fully supported by the specification

The specification uses the word "combining" consistent with its ordinary and broad usage, and also includes preferred embodiments that perform both space-diversity and time-diversity

16

combining.  The word "combining" as used in the specification is always coupled with what is being combined.  For example, the specification states:

> The first RAKE and space-diversity combiner 161 may use any of a number of techniques for <u>combining signals</u>, such as selecting the four strongest signals and adding their strengths, maximal ratio combining, maximal likelihood combining, etc.  RAKE and combining techniques are well known in the art.

Ex. 3, 9:66-10:4, emphasis added.  The cited passage illustrates various generic forms of combining such as "maximal ratio combining" and "maximum likelihood combining," and also specific space-diversity or time-diversity combining techniques ("selecting the four strongest signals and adding their strengths" and "RAKE").  Prucnal Decl., ¶ 23.  Such varied use of the word "combining" is consistent with its ordinary and broad usage.  *See N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1291 (Fed. Cir. 2000) ("[v]aried use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition") (citations omitted).

### 4. The prosecution history of the '322 patent is consistent with the claim language and the teachings of the specification

Again, Defendants want to bootstrap comments taken from the prosecution history of the '322 patent and apply them to limit all the asserted claims of the all three patents.  But, those comments in the '322 prosecution history do not even limit the claims of the '322 patent let alone the '219 and '812 reissue patents.

The '322 patent application is a continuation of Linex's U.S. Patent No. 6,466,610 ("the '610 patent"), which is not asserted.  *See* Ex. 5, page 1.  The claims of the '610 patent recite "multipath" that generates "a multiplicity of fading spread-spectrum signals" and included a plurality of "RAKE and space diversity combiners" for combining these time-diverse resolvable multiplicity of fading spread spectrum signals at each antenna.  *See, e.g.*, Ex. 16 at 14:20, 35.  In contrast to these more narrow claims, the claims of the '322 patent application were intentionally drafted broadly to remove the recitation of the "multiplicity of fading spread spectrum signals" and the accompanying "RAKE combiner."  A person of ordinary skill in the art would understand this progression to mean that time-diverse signals (of the form of "multiplicity of fading spread spectrum signals") and the time-diversity combiner (of the form "RAKE combiner") were being eliminated to remove these aspects

1   of time combining from the claims.  Prucnal Decl., ¶ 79.

2           Notwithstanding the broad language of the claims of the '322 patent, the Texas Court found

3   that certain statements made during the prosecution of the '322 patent application resulted in a

4   disclaimer that should limit "combining" to require space-diversity combining and time-diversity

5   combining.  Ex. 14 at LNXITC00020633-35.  Defendants lean heavily on this prior construction.  As

6   the Federal Circuit has explained on several occasions since then, "the standard for disavowal is . . .

7   exacting."  *Thorner*, 669 F.3d at 1366.  None of the statements in the prosecution history meets this

8   exacting standard.  "The patentee is free to choose a broad term and expect to obtain the full scope of

9   its plain and ordinary meaning, unless the patentee explicitly redefines the term or disavows its full

10  scope."  *Id.* at 1367.  During the prosecution history of the '322 patent, Linex simply did not

11  disavow a system that performs only space-diversity combining, let alone make any argument that

12  can be read as a clear disavowal.

13                  **a.      The October 24, 2003, Office Action (Higashi)**

14          During prosecution of the '322 patent, the Examiner rejected the claims based on U.S. Patent

15  No. 6,026,115 ("Higashi").  Ex. 35 at LNXITC00001778-79.  Higashi discloses a RAKE receiver for

16  a CDMA system having a single receiver antenna.  Ex. 36.  That is, Higashi disclosed a form of a

17  time-diversity combining, but did not disclose multiple antennas or any form of space-diversity

18  combining.  Prucnal Decl., ¶ 29.

19          As is typical when responding to an Office Action during prosecution, before addressing the

20  Examiner's specific rejections, Linex first gave a general description of the overall aspects of the

21  invention.  In part, Linex explained that "the present invention has the advantage of providing space

22  diversity and time diversity . . . ."  Ex. 37 at LNXITC00001826.  This statement alone cannot

23  possibly be considered a clear disavowal of anything.  *See, e.g., Northrop Grumman Corp. v. Intel

24  Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003) (rejecting the district court claim construction based on

25  statements of objects of the invention and advantages of the invention, finding no clear disclaimer);

26  *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) (statements

27  concerning advantages did not import that method of manufacture as a limitation of a claim).

28          In discussing the teaching of Higashi, Linex stated:

> "Higashi et al. do not teach or suggest <u>using a plurality of antennas and/or space diversity</u>, with their RAKE system.  There is no mention of <u>a plurality of antennas</u> in the passage and figure cited by the examiner."

Ex. 37 at LNXITC00001826 (emphasis added).  A person of ordinary skill in the art would understand that the pronoun "their" in this statement refers to the Higashi system, not the claimed Linex system.  In this remark, Linex acknowledged that Higashi was a RAKE system, but it was not distinguishing the Linex invention based on that point.  Rather, Linex simply distinguished Higashi by pointing out two elements Higashi does not contain: (1) a plurality of antennas, and (2) space diversity.  *See* Prucnal Decl., ¶¶ 82, 84.  Clearly, this was not a statement that the Linex system must include both space-diversity and time-diversity.  To the contrary, it was simply a statement that the claimed Linex system included space-diversity, which was not taught by Higashi.

### b.   The December 3, 2003, Office Action (Ono)

The Texas Court also pointed to another Office Action in the prosecution history of the '322 patent.  Ex. 14 at LNXITC00020632-35.  In this subsequent Office Action, the Examiner rejected claim 16 (issued claim 9) of the '322 patent over U.S. Patent No. 5,999,560 ("Ono").  Ex. 38 at LNXITC00001876-77.  Ono discloses a system having both space and time diversity.  Prucnal Decl., ¶ 33.  Therefore, it makes no sense that Linex could distinguish Ono by claiming such a feature.  Any comments about space and time diversity were simply statements about the potential scope of the Linex invention or the teachings of the Ono system, but they were not statements distinguishing the claims.  Instead, to overcome Ono, Linex amended its claims to recite "demultiplex[ing] of data symbols into a plurality of subchannels of data" because the Ono system operates on only a single transmitted signal.  Ex. 39 at LNXITC00001902, 06, 10, and 41.  Indeed, Linex rebutted the Examiner's rejection based on its amendment, arguing the difference between its receiver system and the prior art: "Ono does not teach or suggest a system . . . for receiving data which were <u>demultiplexed</u> . . . ."  *Id*. at LNXITC00001942 (emphasis added).

In sum, the prosecution history of even the '322 patent makes clear that Linex did not limit its claimed inventions to systems that require both space diversity and time diversity.  And, certainly the statements pointed to by Defendants and the Texas Court, do not rise to the level of a clear

disavowal as required by the Federal Circuit.  *See 3M Innovative Properties Co.*, 725 F.3d at 1326

("Where an applicant's statements are amenable to multiple reasonable interpretation, they cannot be

deemed clear and unmistakable."); *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1348 (Fed.

Cir. 2010).

### D.     Combiner circuits/circuitry terms[12]

| Linex Constructions | Defendants Construction |
|---|---|
| i.   combiner circuits for aggregating the received data symbols transmitted in signals distinguishable by the same code and received by the different receiving antennas<br><br>ii.   recovering the data symbols conveyed in the signals and aggregating the received data symbols transmitted in signals distinguishable by the same code and received by the different receiving antennas<br><br>iii.   combiner circuitry for aggregating signals received on said different receiving antennas | i., ii., iii.   circuits that combine data symbols in the separated signals originating from different receiving antennas according to the code transmitted with each signal |

Linex believes that these terms do not require construction because they are phrases that are

well understood.  *See Phillips*, 415 F.3d at 1314.  The USPTO approved this clear language, and

Defendants are obviously trying to rewrite the claims to frame a noninfringement argument.

Each of the disputed terms of the '219 and '812 patents uses the word "combining."  To the

extent the Court feels compelled to construe these terms, Linex's proposed constructions simply

insert Linex's construction of "combining" (i.e., "aggregating") in these terms.  At best, this is the

only substitution to be considered for these otherwise clear phrases.

Defendants essentially rewrite these phrases and inject limitations that would require

multiple versions of received data symbols to be aggregated.  For the reasons discussed *supra*

(Section II.C), the plain language of the claim is clear about what is being aggregated.

### 1.     Ignoring the clear language of the claims, Defendants' construction effectively addresses infringement rather than claim construction by improperly parachuting "separation" limitations

---

[12] For a list of the combiner circuits/circuitry claim terms that are in dispute, see Ex. 42 at 7-8.

into the "combiner circuitry" terms

Defendants' proposed rewrite of the claims actually introduces ambiguity into these otherwise clear claims. For example, the plain language of claim 97 of the '219 patent recites that "received data symbols transmitted in signals with the same code" are combined. Ex. 3, 28:15-16. Defendants' construction changes that language to combine data symbols "in the separated signals originating from different receiving antennas." If "separated signals" is taken to mean multipath versions of each signal that are separately detected at <u>each antenna</u>—which Defendants appear to be imposing on the construction of the "separating" terms as discussed in Section II.F below—then their construction once again imposes a RAKE combiner for combining these "multipath" versions at each antenna into each of the combiner circuitry limitations. *See* Pruncal Decl., ¶ 93. Such an interpretation is simply wrong, especially where the "combiner circuits" or "recovering" limitations do not even recite "separated signals." *See* Ex. 4, claims 97, 107, 109, 121, 131, 133; Ex. 3, claims 97, 101, 106.

In sum, there is simply no basis in either the plain language of the claims or the intrinsic and extrinsic evidence to import any type of multipath combining limitation into the claims of the '219 and '812 patents. *See* Pruncal Decl., ¶ 94. Thus, the Court should reject Defendants' construction, which injects such a multipath combining limitation, and should adopt Linex's constructions if the Court feels that construction is even necessary.

E.     **"a plurality of despreading devices for detecting, at each receiver antenna of the plurality of receiving antennas, the first spread-spectrum signal and the second spread-spectrum signal, as a first plurality of detected spread-spectrum signals and a second plurality of detected spread spectrum signals, respectively"[13]**

| Linex Construction | Defendants Construction |
|---|---|
| a plurality of devices in the receiver that reverses the spreading operation that occurred in the transmitter for determining the presence of and recovering both the multipath first spread-spectrum signal and multipath second spread-spectrum signal received at each antenna port | each receiving antenna has a plurality of despreading devices for detecting a plurality of multipath signals for each of the first spread spectrum and second spread spectrum signals |

---

[13] The term appears only in claim 9 of the '322 patent.

LINEX'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 4:13-cv-00159-CW  (MEJ)

Again, Linex believes that this term does not require construction because the term is simple and clear, and Defendants are obviously trying to rewrite the claims to manufacture a noninfringement argument, not for the purposes of claim construction.

### 1. Ignoring simple rules of grammar, Defendants' construction rests on a tortured reading of the claim to require multiple despreaders at each antenna and must be rejected because the phrase "at each receiver antenna" modifies "detecting," not despreaders

Claim 9 defines a receiver system that includes a plurality of despreading devices, which reverse the spreading operation.  The simple grammatical structure of this phrase reveals that it is easily understood.  The noun phrase "a plurality of despreading devices for detecting" is separated by a comma from the modifying phrase "at each receiver antenna of the plurality of receiver antennas." Ex. 5, 15:59-60.  This modifying phrase specifies the location of the <u>detecting</u> operation, not the physical location of the <u>despreading devices</u>.  One of ordinary skill in the art would readily understand that the modifier phrase after the "comma" modifies the closest subject (in this case, "detecting"), not the phrase further removed from the comma (in this case, "plurality of despreading devices").  Prucnal Decl., ¶ 97.  Thus, the "plurality of despreading devices" refers to all the despreading devices, which together detect the signals at each receiver antenna.  It does not refer to multiple despreading devices at each antenna, as Defendants propose.  And, the output of all these despreading devices is simply referred to as the first and second pluralities of detected spread spectrum signals. *Id*. at ¶ 97.

In addition to being inconsistent with the plain meaning of the claim, Defendants' construction once again seeks to impose a single-antenna "RAKE" limitation into the claims.  Defendants appear to interpret their construction to require "detecting a plurality of multipath signals" to mean <u>separately</u> detecting a plurality of multipath signals (as opposed to detecting them as one composite signal) at each antenna.  As such, Defendants improperly impose a single-antenna RAKE limitation. Ex. 43, ¶ 447.  Linex's construction stays true to the actual claim language, which is broad enough to cover a system with a plurality of receiving antennas, and detecting one spread spectrum signal at each antenna resulting in detecting a plurality of spread spectrum signals.  Prucnal Decl., ¶ 97.  This is not surprising because, as explained previously in

1    Section II.C.3, Linex drafted claims broadly to cover embodiments in which only one signal for

2    each stream is detected at each antenna.  Prucnal Decl., ¶ 97.

3         Thus, the Court should reject Defendants' construction, which is nothing more than an

4    attempt to create a noninfringement position under the guise of claim construction by requiring

5    multiple despreaders at each antenna and RAKE combining.

6    **F.    Separating terms[14]**

| Linex Construction | Defendants Construction |
|---|---|
| i.   distinguishing the different signals in response to the detection of the different codes conveyed in the signals. | i., ii., iii., iv., v.   separating the received signals into the individual transmitted signals and their multipath components by detecting the codes mixed with the data symbols in each individual transmitted signal |
| ii.  distinguishing each of the received spread spectrum signals in response to the detection of the different codes conveyed in the spread spectrum signals. | |
| iii. distinguishing each of the spread spectrum signals received at each receiving antenna in response to the detection of the different codes conveyed in the spread spectrum signals. | |
| iv.  distinguishing the different signals in response to the detection of the different codes conveyed in the signals. | |
| v.   distinguishing the different spread spectrum signals in response to the detection of the different codes conveyed in the signals. | |

20        Linex believes that these terms require no construction because the phrases are simple and

21   easily understood, while Defendants rewrite the claims to frame a noninfringement argument.  The

22   ordinary meaning of "separating" is distinguishing.[15]  At best, this is the only substitution that can

23   be considered for these otherwise clear phrases.

24

25   _____

26   [14] For a full list of the separating terms, please see Ex. 42 at 5-7

27   [15] *See* Ex. 41 at 1242 (defining "separate" as "**2**: To differentiate or discriminate between;
     distinguish.").

28

1

2

3   **1.    Defendants construction, once again, seeks to shoehorn multipath limitations and spreading functions despite the marked absence of either in the claims**

Defendants' construction is particularly problematic because it suggests the same construction for all five phrases, but each phrase is intentionally different. [16]  Moreover, Defendants' construction is inappropriate because it renders the "spread spectrum" language superfluous and suggests that "spread spectrum signals" is synonymous with "signals."  *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("[C]laim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous . . . .").

Defendants' construction also imports a specific result of the claimed separation operation which simply does not exist in the plain language of the claim.  That is, Defendants' construction requires separation into "multipath components."  This is contrary to the claim language and the intrinsic evidence.  The claims of the '219 and '812 patents (which include the "separating terms") do not recite multipath.  Communication in a multipath channel is simply not a required element of the inventions claimed in the '219 and '812 patents.  Indeed, the '219 and '812 reissue claims were appropriately sought to add new claims covering receiver systems and methods for processing received signals containing codes indicating transmission of the signals from different transmitting antennas.  *See, e.g.*, Ex. 13 at LNXITC00001508-09; Ex. 20 at LNXCAL00071023.  Receiving <u>multipath</u> signals is not a required element of any of the asserted claims of the '219 and '812 patents.

As explained previously, one described embodiment selects the four strongest signals detected at the four receiver antennas and combines them.  *See* Ex. 4, 9:65-10:2.  In this embodiment only one signal for each stream is selected at each antenna for combining with each other.  Defendants' proposed construction calls for "separating the received signals . . . and their multipath components . . . ."  If Defendants' construction applies to separating the signals at one

---

[16] Terms (i) and (iv) recite separating "said signal" or "said different signals"; and terms (ii), (iii), and (v) recite separating "said spread spectrum signals" or "said different spread spectrum signals."

1     antenna, it excludes the described embodiment and is improper.  *See* Pruncal Decl. at ¶ 101.

2            Defendants' construction also adds the limitation that the codes conveyed in the transmitted

3     signals are "mixed with the data symbols."  This construction actually makes the phrase

4     ambiguous—therefore, it is not helpful— because it is not clear what "mixed with the data

5     symbols" means.  Further, Defendants' construction appears to import a further limitation from the

6     specification, i.e., direct sequence spread spectrum.  But, as discussed above in Section II.E,

7     certain claims do not even have a "spread spectrum" limitation, let alone a "direct sequence"

8     spread spectrum limitation.  Imposing such a limitation from the preferred embodiment into the

9     claim is clearly improper, as the Federal Circuit has "repeated[ly] state[d] that limitations from the

10    specification are not to be read into the claims[.]"  *Comark Commc'ns, Inc. v. Harris Corp.*, 156

11    F.3d 1182, 1186 (Fed. Cir. 1998).

12           Finally, certain unasserted dependent claims recite more specific forms of codes that

13    perform "spreading":  "chip sequence codes" ('219 patent, claim 99) and "spreading codes" ('812

14    patent, claim 114).  The doctrine of claim differentiation precludes adding spreading functions of

15    the more specific codes from the dependent claims into their independent parent claims.  *See*

16    *InterDigital*, 690 F.3d at 1324.  The independent claims simply recite that the codes are conveyed

17    in the "signals" or spread spectrum signals," without regard to any spreading function being

18    performed.

19    **III.      CONCLUSION**

20           In sum, as expressed above, while Linex suggests that the claim terms and phrases are clear

21    and require little, if any, further construction or rephrasing, the Defendants choose to use this claim

22    construction procedure to argue noninfringement by rewriting the claims to read in as many

23    technical concepts as possible from the disclosed preferred embodiments and to pretend that Linex

24    limited its inventions via discussions with the USPTO.  Such arguments are routinely rejected for

25    good cause by this Court and the Federal Circuit, and should be rejected again in this case.  The

26    claims are clear as written, they require little, if any, rewording, and any question of scope should be

27    left for a jury.

28

1    Dated:  November 7, 2013                    Respectfully submitted,

2                                                  */s/ Robert F. McCauley*
                                                 Robert F. McCauley (SBN 162056)
3                                                Robert.mccauley@finnegan.com
                                                 FINNEGAN, HENDERSON, FARABOW,
4                                                GARRETT & DUNNER, LLP
                                                 Stanford Research Park
5                                                3300 Hillview Avenue
                                                 Palo Alto, CA 94304-1203
6                                                Telephone: (650) 849-6600
                                                 Facsimile: (650) 849.6666
7

8                                                Vincent P. Kovalick (*Pro Hac Vice*)
                                                 Vincent.kovalick@finnegan.com
9                                                Barry W. Graham (*Pro Hac Vice*)
                                                 Barry.graham@finnegan.com
10                                               Richard H. Smith (*Pro Hac Vice*)
                                                 Richard.smith@finnegan.com
11                                               Troy E. Grabow (*Pro Hac Vice*)
                                                 Troy.grabow@finnegan.com
12                                               Rajeev Gupta (*Pro Hac Vice*)
                                                 Rajeev.gupta@finnegan.com
13                                               Kenie Ho (*Pro Hac Vice*)
                                                 Kenie.ho@finnegan.com
14                                               Cecilia Sanabria (*Pro Hac Vice*)
                                                 Cecilia.sanabria@finnegan.com
15                                               Jia Lu (*Pro Hac Vice*)
                                                 Jia.lu@finnegan.com
16                                               FINNEGAN, HENDERSON, FARABOW,
                                                 GARRETT & DUNNER, LLP
17                                               901 New York Avenue, N.W.
                                                 Washington, D.C. 20001-4413
18                                               Telephone: (202) 408-4000
                                                 Facsimile: (202) 408-4400
19

20                                               *Attorneys for Linex Technologies, Inc.*

21

22

23

24

25

26

27

28

LINEX'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 4:13-cv-00159-CW  (MEJ)