1   William F. Lee (*pro hac vice*)
    william.lee@wilmerhale.com
2   Dominic E. Massa (*pro hac vice*)
    dominic.massa@wilmerhale.com
3   Elizabeth M. Reilly (*pro hac vice*)
    beth.reilly@wilmerhale.com
4   Jonathan W. Andron (*pro hac vice*)
    jonathan.andron@wilmerhale.com
5   WILMER CUTLER PICKERING
        HALE AND DORR LLP
6   60 State Street
    Boston, Massachusetts  02109
7   Telephone:  (617) 526-6000
    Facsimile:  (617) 526-5000
8
    Mark D. Selwyn (CA SBN 244180)
9   mark.selwyn@wilmerhale.com
    WILMER CUTLER PICKERING
10       HALE AND DORR LLP
    950 Page Mill Road
11  Palo Alto, California  94304
    Telephone:  (650) 858-6000
12  Facsimile:  (650) 858-6100

13  Mark C. Scarsi (SBN 183926)
    mscarsi@milbank.com
14  Jennifer L. Miremadi (SBN 245559)
    jmiremadi@milbank.com
15  Miguel Ruiz (SBN 240387)
    mruiz@milbank.com
16  Ashlee N. Lin (SBN 275267)
17  ashlee.lin@milbank.com
    Michael Sheen (SBN 288284)
18  msheen@milbank.com
19  MILBANK, TWEED, HADLEY & McCLOY LLP
20  601 South Figueroa Street, 30th Floor
    Los Angeles, California 90017
21  Telephone:  (213) 892-4000
    Facsimile:   (213) 629-5063
22
    *Attorneys for Defendant Apple Inc.*
23
    Robert T. Haslam (Bar No. 71134)
24  rhaslam@cov.com
    Deanna L. Kwong (Bar No. 233480)
25  dkwong@cov.com
26  COVINGTON & BURLING LLP
    333 Twin Dolphin Drive, Suite 700
27  Redwood Shores, CA 94065
28

Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Additional counsel listed on signature page

*Attorneys for Defendant Hewlett-Packard Company*

Michael J. Bettinger (SBN 122196)
mike.bettinger@klgates.com
David Shane Brun (SBN 179079)
shane.brun@klgates.com
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8200
Facsimile: (415) 882-8220

*Attorneys for Defendant Aruba Networks, Inc.*

L.Scott Oliver (SBN 174824)
SOliver@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792

*Attorneys for Defendant Meru Networks, Inc.*

Colby B. Springer (SBN 214868)
CSpringer@lrrlaw.com
LEWIS ROCA ROTHGERBER LLP
2440 W. El Camino Real, Sixth Floor
Mountain View, CA 94040
Telephone: (650) 391-1380
Facsimile: (650) 687-8492

W. Brent Rasmussen (*Pro Hac Vice*)
BRasmussen@LRRLaw.com
Shane E. Olafson (*Pro Hac Vice*)
SOlafson@LRRLaw.com
LEWIS ROCA ROTHGERBER LLP
40 N. Central Ave., Suite 1900
Phoenix, AZ 85004
Telephone: (602) 262-5327
Facsimile: (602) 734-3756

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Jonathan W. Fountain (*Pro Hac Vice*)
JFountain@LRRLaw.com
LEWIS ROCA ROTHGERBER LLP
3993 Howard Hughes Pkwy., Suite 600
Las Vegas, NV 89169
Telephone: (702) 949-8230
Facsimile: (702) 949-8364

*Attorneys for Defendant Ruckus Wireless, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

LINEX TECHNOLOGIES, INC.,

       Plaintiff,

    vs.

HEWLETT-PACKARD COMPANY,
APPLE COMPUTER, INC.,
ARUBA NETWORKS, INC.,
MERU NETWORKS, INC.,
RUCKUS WIRELESS, INC.,

       Defendants.

Case No. 4:13-cv-00159-CW (MEJ)

**DEFENDANTS' RESPONSIVE
CLAIM CONSTRUCTION BRIEF
AND MOTION FOR SUMMARY
JUDGMENT OF NON-
INFRINGEMENT AND INVALIDITY**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT at 2:00 p.m. on January 23, 2014, Defendants Apple Inc. ("Apple"), Hewlett-Packard Company ("HP"), Aruba Networks Inc. ("Aruba"), Meru Networks ("Meru"), and Ruckus Wireless ("Ruckus") (collectively, "Defendants") will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for summary judgment as to:  (1) non-infringement of all asserted claims, *i.e.*, claims 97, 98, 101, 102, and 106 of the '812 patent; claims 97, 107, 108, 109, 119, 120, 121, 131, 132, 133, 144, and 145 of the '219 patent; and claims 9 and 10 of the '322 patent; and (2) invalidity of all asserted claims of the '812 and '219 patents, *i.e.*, claims 97, 98, 101, 102, and 106 of the '812 patent and claims 97, 107, 108, 109, 119, 120, 121, 131, 132, 133, 144, and 145 of the '219 patent.

## **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ......................................................................1
    A.   Technology Background & Prior Art ...............................2
    B.   Wireless LAN and 802.11...............................................5
    C.   Prior Litigations & Reissue Patents ...............................5
II.   CLAIM CONSTRUCTION / DISPUTED TERMS ......................6
    A.   "Spread Spectrum Signals"..............................................6
        1.   Linex Cannot Avoid Previous Claim Construction Rulings by a Federal District Court..........................6
        2.   The Specification and Claims Support Defendants' Construction.............................................7
        3.   The Prosecution History Supports Defendants' Construction.............................................9
        4.   Linex's Arguments Lack Merit......................................9
    B.   "Code(s)" .......................................................................11
        1.   Defendants' Construction is Supported by the Specification. .......11
        2.   The Prosecution History Supports Defendants' Construction .......12
        3.   Defendants' Construction is Consistent with Core Legal Principles. ..............................12
        4.   Linex's Arguments Lack Merit......................................13
    C.   "Combining" ...............................................................14
        1.   Specification ..............................................................15
        2.   Prosecution History....................................................16
    D.   Combiner circuits/circuitry terms ..................................17
    E.   "Despreading devices"..................................................18
    F.   "Separating" ...............................................................19
III.  SUMMARY JUDGMENT OF NON-INFRINGEMENT ....................22
    A.   The Accused OFDM Products ........................................22
    B.   Non-Infringement of the Accused Products .......................23
        1.   Under Defendants' Construction of "Codes" and "Spread Spectrum Signal," No Asserted Claim is Infringed .......24
        2.   Under Any Construction of "Codes… Conveyed Along With" and "In," No Asserted Claim of the '219 or '812 Patent is Infringed. .......26
        3.   Under Defendants' Construction of "Separating" and "Combining," No Asserted Claim is Infringed.......28
IV.  SUMMARY JUDGMENT OF INVALIDITY ............................31
    A.   Paulraj Anticipates Each Asserted Claim of the '219 and '812 Patents ....31
        1.   The '599 Paulraj Patent................................................31
        2.   Under Linex's Proposed Constructions and Infringement Theory, Paulraj Anticipates the Relevant Claims .......32

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF AUTHORITIES

Page(s)

CASES

*Ariad Pharm., Inc. v. Eli Lilly and Co.*,
   598 F.3d 1336 (Fed. Cir. 2010)..............................................................................11

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
   438 F.3d 1374 (Fed. Cir. 2006)................................................................13, 14, 20

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*,
   554 F.3d 1010 (Fed. Cir. 2009)..............................................................................13

*Omega Eng'g, Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)..............................................................................16

*Otter Prods., LLC v. Treefrog Devels Inc.*,
   2012 U.S. Dist. LEXIS 139253 (D. Colo. Sept. 27, 2012)....................................21

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
   653 F.3d 1296 (Fed. Cir. 2011)..............................................................................14

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001)..............................................................................12

*Single Touch Interactive, Inc. v. Zoove Corp.*,
   Case No. 12-cv-831 (N.D.Ca. Nov. 26, 2013).......................................................7, 8

*Tandon Corp. v. Int'l Trade Com'n*,
   831 F.2d 1017 (Fed. Cir. 1987)........................................................................14, 15

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007)..................................................................12, 15, 16

*Wang Labs., Inc. v. Am. Online, Inc.*,
   197 F.3d 1377 (Fed. Cir. 1999)..............................................................................13

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## I.    INTRODUCTION

In recent decades, demand for wireless communication has exploded from simple applications, like cellular voice calls, to complex applications like streaming video and Internet browsing.  Wireless communication technology has changed rapidly to meet this demand.  One such technology is wireless local area networking (WLAN).  Today, WLAN is mainly implemented in an open, public standard developed by the Institute of Electrical and Electronics Engineers (IEEE), and known as 802.11.

A version of this standard known as 802.11n is relevant to this case.  802.11n uses a wireless technology known as orthogonal frequency division multiplexing (OFDM), and combines this technology with a multiple antenna technology known as "MIMO" ("multiple-in multiple-out") to provide high capacity wireless communications.

The Linex patents relate to a different wireless technology called *spread spectrum*.  In the 1990s, this technology was used in proprietary cellular services, such as those provided by Verizon Wireless.  OFDM technology in 802.11n is fundamentally different from the spread spectrum technology described in the Linex patents.

Through its proposed constructions, Linex attempts to stretch its spread spectrum patents to cover OFDM technology that it did not invent and its original patent application was never intended to cover.  Linex's attempted manipulation is evident in many ways, for example, in (i) its continuous redrafting of its patent claims (the '812 was filed 13 years after the original application), (ii) its new use of words and phrases in those claims that do not appear in the specification, and (iii) its extensive use of extrinsic evidence to try to broaden Linex's patents far beyond what they actually disclose.

Although this combined brief presents several issues, two issues going to the heart of the distinction between the claimed spread spectrum system and the accused OFDM/MIMO products – the construction of "codes" and "spread spectrum signal" – are dispositive of Linex's entire infringement case.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

A.      **Technology Background & Prior Art**

The three Patents-in-Suit share substantially the same specification and are based on an application filed in 1998.  They relate generally to using *time diversity <u>and</u> space diversity* while sending data using *spread spectrum* technology:

> **<u>A system and method for transmitting… spread-spectrum signals</u>**….  The plurality of spread-spectrum signals are radiated by a plurality of antennas…. A plurality of receiver antennas receive the plurality of spread-spectrum signals and a plurality of fading spread-spectrum signals…. **A RAKE ["time diversity combiner"] and space-diversity combiner combines… a respective plurality of detected spread-spectrum signals and a respective multiplicity of detected-multipath-spread-spectrum signals, to generate a plurality of combined signals**.

Dkt. 235-7 ("'322"), Abstract.  Spread spectrum transmission technology modifies a data signal by spreading the data over a much broader range of frequencies ("bandwidth") than is required to carry the data alone, in order to decrease the effects of interference.  *See, e.g.*, accompanying Declaration of Anthony Acampora ("Acampora Decl.") ¶ 8.  The Patents-in-Suit disclose only a single form of spread spectrum known as direct sequence spread spectrum (DSSS).  In DSSS, each information bit (a 1 or a 0) is converted, through the use of a "chip-sequence" spreading code, into a set of binary values called "chips." *Id.* ¶ 14.  For example, if a system uses four chips per bit and the spreading code is 1010, the bit "1" may be transmitted as a chip sequence "1010", and "0" as "0101".  This approach allows different streams of data with different codes to be transmitted simultaneously using one carrier frequency, and allows individual signals to be detected using their respective spreading codes.  *Id.* Spread spectrum techniques (including DSSS) were well-known, especially in cellular communications, long before Linex's alleged invention.  *Id.* ¶ 11 (citing references from 1980s and 1990s).

The Patents-in-Suit combine known techniques of space diversity and time diversity to improve reliability in spread spectrum systems.  "Diversity" in this context refers to the use of multiple copies of the same data signals to enhance reliability.  Diversity can be achieved in different ways.  In one relevant example of space diversity, physically-spaced receiver antennas (RAs) each receive the same signal sent from a transmitting antenna (TA).

2

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   The receiver can add the received signals together or select the stronger received signal to

2   improve reliability.  Acampora Decl. ¶¶ 81-83.

3        Time diversity, in contrast, results from a phenomenon known as "multipath," in

4   which multiple copies of a signal are created unintentionally as a signal reflects off

5   obstructions in the path between a TA and a RA (*i.e.*, multipath refers to reflections between

6   a single TA/RA).  Acampora Decl. ¶¶ 22, 95; Dkt. 235-1 ("Prucnal Decl.") ¶ 19.  Multipath

7   causes multiple copies of the transmitted signal to be received at different points in time;

8   signals that travel different paths will take different amounts of time to reach the receiver.

9   Multipath can result in the different signals interfering with each other, but characteristics of

10  spread spectrum allow multipath to be used to improve reliability.  Acampora Decl. ¶¶ 95-

11  103; Ex. 1 ("Acampora Invalidity Rpt.") ¶ 323.[1]  DSSS systems used a known type of

12  receiver, called a "rake", to separately detect and store those multiple time-offset copies.  *Id.*

13  The receiver can take advantage of this time diversity to improve performance by selecting

14  the strongest multipath copy of the signal, or by summing multiple multipath copies.

15       The seven figures in the Patents-in-Suit illustrate several variations of transmitters

16  and receivers, each using a combination of space and time diversity.  Figures 1, 2, 4, and 5

17  show transmitter embodiments.  "Data" enters, passes through a "Forward Error Correction"

18  (FEC) device and an "interleaver," and is then "demultiplexed" (split) into subchannels of

19  data.  The subchannels are each processed by a "chip-sequence signal generator" that applies

20  a different spreading code to each subchannel, thereby generating "spread spectrum signals."

21  Prucnal Decl. ¶ 17.  Thus, each TA has a spreading code.

22       Figures 3, 6, and 7 depict receiver embodiments, each with a plurality of receiver

23  antennas (RA's), matched filters, and RAKE and space combiners.  Because the signals were

24  spread with a particular code, they need to be "despread" back into information bits (by

25  detecting that code) and then separated.  This despreading and separating is accomplished

26

27  [1] Exhibits in this brief are attached to the supporting Declaration of Jonathan W. Andron.

28

3

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

with a set of devices called "matched filters" (MFs). At each RA, there is a set of MFs (one for each TA) that corresponds to the different spreading codes. These MFs despread the signals that were spread at each TA, and also detect the multiple time-offset copies of each despread signal. These MFs provide the despread signals and time-offset copies to the "RAKE **and** space combiners," which combine the signals that shared the same spreading code. All or a subset of these signals can be combined to improve reliability. The output of each "combiner" is a subchannel of data. Multiple subchannels of data (from the multiple combiners) are then multiplexed (concatenated) into a stream of data that passes through a "de-interleaver" and an "FEC decoder" to reproduce the original data. *See generally* Acampora Decl. ¶ 93-103.

The term "separate" appears in the claims for the first time in the '219 and '812, and does not appear in the specification of the Patents-in-Suit in the context it is used in the claims. The disclosed embodiments in the specification illustrate what "separating" means.



Figure 3 from the patents, and newly created Figure (b), show space and time separation. Each receiver antenna system (e.g., RA1 and MF 24, 34, 44, and 54) receives four spatial signals, one for each TA, and further separates faded time-offset signals. '322 at 8:21-9:20. In a system in which each MF 1 detects three (3) time-delayed copies of the first transmitted signal, the set of four (4) MF1s (MF1 24, MF1 25, MF1 26, and MF1 27) will jointly provide 4 x 3 = 12 space/time signals to the first RAKE/space combiner as shown in Figure (b)

4

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

above. Combiner 161 can combine 4, 8, 12, or whatever number of these signals is desired, thereby taking advantage of time diversity and space diversity. Acampora Decl. ¶¶ 100-101.

## B. Wireless LAN and 802.11

OFDM systems, such as the accused products, transmit data in multiple narrow-bandwidth subcarriers without being spread and without transmitting data in one stream over one carrier frequency, as in spread spectrum.



As indicated in the figures above, spread spectrum takes a narrowband signal (green) and spreads the signal to be transmitted across a much wider bandwidth by using a spreading code (not illustrated). In contrast, OFDM uses multiple narrowband subcarriers *without* spreading as also shown above. *See* Acampora Decl. ¶¶ 14-15, 57-59, 205-212. For example, if one were sending 1000 bits and there are 8 chips per bit, a spread spectrum system sends 8000 zeroes and ones. With OFDM, the 1000 bits are distributed across the subcarriers but there are no transmitted codes that substantially increase the number of bits transmitted. Because 802.11n does not use up bandwidth by spreading the data with spreading codes or by using such codes to mark individual signals, it can achieve the full capacity potential of MIMO, unlike the Linex patents. Acampora Decl. ¶¶ 84-92, 104-107.

## C. Prior Litigations & Reissue Patents

Linex has previously attempted to enforce some of the same claims asserted in the present case. Linex brought suit in the Eastern District of Texas on June 1, 2007. Linex attempted to read the '322 claims onto the 802.11n standard in the Texas case as well, but dismissed those claims after receiving the Texas court's Markman ruling. In an effort to circumvent that ruling, Linex went back to the PTO and added new claims to the '219 reissue

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

application on February 23, 2010 and filed the '812 reissue application on March 9, 2011. While the '812 was pending, Linex brought suit in the International Trade Commission ("ITC") on both the '322 and the '219 patents on May 6, 2011, which it withdrew immediately after the Staff Attorney issued his brief recommending a finding of non-infringement.  Shortly thereafter, during prosecution of the '812, Linex attempted to retract statements it had made during the earlier '219 and '322 prosecutions, in an attempt to circumvent the problems it had encountered in the ITC.  Dkt. 235-42 (July 6, 2012 Response to Office Action) at 16-18.  Linex is thus using the '812 and '219 reissue applications improperly to attempt to broaden the claims beyond the disclosed spread spectrum systems.

## II.   CLAIM CONSTRUCTION / DISPUTED TERMS

### A.   "Spread Spectrum Signals"[2]

Defendants' construction recognizes that the claimed "spread spectrum signals" are generated by processing "data"[3] with "one or more [spreading] codes."  In contrast, relying primarily on extrinsic evidence, Linex replaces "one or more codes" with the amorphous term "coding," and ignores that it is *data* that must be processed and spread.  Linex's construction is inconsistent with the intrinsic and extrinsic evidence, improperly broadens "spread spectrum" beyond its well-understood meaning, and contradicts the Texas court's decision correctly interpreting precisely the same language in the same patent.

### 1.   Linex Cannot Avoid Previous Claim Construction Rulings by a Federal District Court.

In *Linex Technologies v. Belkin International, Inc. et al.*, the Eastern District of Texas construed the same language in Claim 9 of the '322.  After considering the parties' proposed constructions and the intrinsic and extrinsic evidence—***including a proposed construction by***

---

[2] *See* proposed constructions in Dkt. 200 (Joint Claim Construction Statement).

[3] Linex repeatedly suggests that Defendants' construction requires that the "data" be "user data."  This is incorrect; Defendants' construction simply refers to "data."

6

1    ***Linex similar to what it now opposes***[4]—the Texas court correctly concluded that: "A spread-

2    spectrum system is a wireless communication system in which ***data*** to be transmitted is

3    ***processed*** with one or more ***codes*** to generate a signal which is distributed across the

4    available bandwidth" (emphasis added). Dkt. 235-16 ("Texas Order") at 19-20.  The Texas

5    court held "the term 'spread spectrum subchannel signals' is properly construed as 'signals,

6    corresponding to each of the subchannels of ***data***, which have been ***processed*** with one or

7    more ***codes*** that distributes each signal across the available bandwidth'" (emphasis added).

8    *Id.* This Order was entered in 2009 during the prosecution of the '219 reissue, and before the

9    '812 was even filed.  Nonetheless, Linex continued to use the same term ("spread spectrum

10   signal") during prosecution of these patents even after the Texas court issued this

11   construction, never informing the PTO of this construction or making any effort to

12   distinguish it.  Linex's efforts to avoid this construction are misplaced.  *See, e.g., Single*

13   *Touch Interactive, Inc. v. Zoove Corp.*, Case No. 12-cv-831  (N.D.Ca. Nov. 26, 2013)

14   (refusing to vacate Markman order after settlement because "other courts may consider it for

15   its persuasive value" and "the value of [the Court's] efforts would be diminished if the order

16   were vacated, increasing the possibility that other courts would be called upon to expend

17   their resources to construe these same terms in the future").[5]

18              2.       **The Specification and Claims Support Defendants' Construction.**

19          The Texas court reached a substantially correct construction, and had no need to

20   consider extrinsic evidence.  In every disclosed embodiment, spread spectrum signals are

21   generated by processing "data" with "codes."  Figures 1, 2, 4, and 5 of the Linex patents

---

[4] Linex proposed a construction requiring, *inter alia*, that "…***data*** is distributed across the allowed spectrum…." Dkt. 235-16 at 9.

[5] Defendants' construction differs slightly from the Texas court's by clarifying that the "bandwidth of the ***data***" is distributed across the available bandwidth.  However, the Texas court's "definition" of "spread spectrum system" makes clear that the ***data*** is processed and distributed.  Similarly, the Texas court's construction of "plurality of spread-spectrum signals" incorporated the "data processing" limitation from its definition of "spread spectrum processing."  Texas Order at 22; *see also* Dkt. 235 ("Linex Br.") at 8.

---

7

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   depict *all* of the disclosed transmitter embodiments, and all use a "chip-sequence" spreading

2   code to generate the claimed spread spectrum signals.  In each case, the specification

3   explains that the spread spectrum "signal" is generated by processing "data" (the "plurality of

4   subchannels of data") with a "chip-sequence signal generator" (i.e., a "code") to create the

5   spread spectrum signal that is transmitted.  *See, e.g.*,'322 at 7:45-47 ("[S]pread-spectrum

6   processing typically includes multiplying the plurality of subchannels of data by the plurality

7   of chip-sequence signals.");[6] *see also id.* at 2:14-22, 2:47-53, 5:15-28, 5:36-49, 6:28-35, 7:8-

8   24, 7:45-47, 11:13-19, and 12:52-58; '322 at Figs 1, 2, 4, and 5.

9           The specification repeatedly and consistently teaches that the spread spectrum signal

10   is generated by processing data with a *code*—in particular, a chip-sequence signal generator,

11   and discloses no other option.  For example, the descriptions to Figures 1, 2, 4, and 5 use

12   "code" to describe the chip-sequence signals that process "data."  *See* '322 at 4:1-13.

13   Elsewhere, the specification consistently uses the term "chip-sequence" to refer to the code

14   that generates the spread spectrum signal.  *See, e.g.*, *id.* at 2:14-22, 2:47-53, 5:15-28, 5:36-49,

15   6:28-35, 7:8-24, 7:45-47, 11:13-19, and 12:52-58.  Furthermore, the specification confirms

16   that the chip-sequence code generates the spread spectrum signal by characterizing it as a

17   "*spread spectrum* means," differentiating it from the "FEC means" and all other components

18   of the transmitter.  *Id.,*  4:47-62; Dkt. 235-5 ("'219") at 4:54-5:2; Dkt. 235-6 ("'812) at 4:56-

19   5:4; Figs 1, 2, 4, and 5 (showing that in all transmitter embodiments the "chip-sequence

20   signal generator" is the last item in the processing chain before the transmitters TA1, TA2,

21   TA3, and TA4); and 4:1-12 (describing the "codes" in the Figures as distinct from the

22   "separate FEC encoders").

23

24   ───────────────

25   [6] Linex seizes on the patent's use of the term "typically" to suggest that "spread spectrum

26   processing" may include processing of a signal as opposed to data. Linex Br. 9-10.  But
     "typically" in this context merely indicates that the spreading code may process data in some

27   other way than multiplying a plurality of subchannels of data by a chip-sequence signal.  The
     patent never once refers to spread spectrum processing of anything other than data.

28

Moreover, Defendants' construction is compelled by the structure of the claims.  The relevant claims recite: a "system for receiving data… demultiplexed into a plurality of subchannels of data [that are] spread spectrum processed" ('322 cl. 9); "a [method / receiver system] for recovering data in spread spectrum signals" ('812 cl. 101, '219 cls. 121, 133).  Thus, the claimed "spread spectrum signals" are created by processing *data*.  Linex's construction suggests that a spread spectrum signal can be generated by processing some (undefined) signal, other than data.  This is inconsistent with the specification, which never suggests that the spread spectrum signal consists of anything other than coded data.

### 3.     The Prosecution History Supports Defendants' Construction.

During prosecution of the '219, Linex amended the specification to read "[e]ach spread-spectrum subchannel is defined by <u>the code represented by</u> a respective chip-sequence signal." 5:28-30 (underlining in '219).  Linex explained that "the code represented by" is "inherent in spread spectrum processing."  Dkt. 235-12 (Feb. 23, 2010 Resp. to Office Action) at 2, 12.   In other words, the use of the "codes" referred to in the specification and claims are "inherent" to spread spectrum systems.  *See also* Acampora Decl. ¶ 27-46.

### 4.     Linex's Arguments Lack Merit.

***First***, Linex apparently agrees that in the disclosed embodiments, "spread spectrum signals" are generated by processing data with "codes," Linex Br. 9, but suggests that spread spectrum signals can also be generated using "coding algorithms" instead of "codes."  *See also* Ex. 3 ("Prucnal Infringement Rpt.") ¶ 131 ("The 'codes' ***are*** the chip-sequences generated by the chip-sequence signal generator.") (emphasis added)).  This is contrary to the specification and structure of the claims.  The specification repeatedly refers to different types of coding algorithms, yet makes clear in each instance that the coding algorithm is ***not*** what generates the claimed spread-spectrum signals.  For example, the specification depicts "FEC encoders," a form of coding algorithm, in every transmitter embodiment.  However, in each instance, the spread spectrum "signal" is not "generated" until after a "code" is applied to data using the "chip sequence signal generator"—even though the "FEC encoding" occurs

9

1   earlier in the processing chain.  *See* Figs. 1, 2, 4, and 5 (showing chip sequence "signal

2   generator" *follows* the "FEC encoder" in processing chain); '219 at 4:56-5:4 ("FEC

3   [encoding] means" is separate from "spread spectrum means").  This is consistent with the

4   well-understood meaning of spread spectrum in the art—including the understanding of the

5   inventor himself. ████████████████████████████████████████████████████

6   ██████████████████████████████████  *see also* Acampora Decl. ¶¶ 111,

7   132, 149-154.  Throughout the specification, it is the spreading code, not the FEC or any

8   other "coding algorithm," that generates the spread spectrum signal.

9        **Second**, Linex attempts to circumvent and denigrate the Texas court's construction as

10   being "based on less than a full survey of the [extrinsic] evidence," and then cherry-picks

11   extrinsic examples in which "spread spectrum signals" supposedly are not generated by

12   processing "data" with "codes."  Linex Br. 10-12.  But Linex already had a full and fair

13   opportunity to present extrinsic evidence to the Texas court, and that evidence amply

14   supported that court's construction.  *See* Linex Br. 8-9 (identifying numerous sources of

15   extrinsic evidence considered by the court).  This Court should reject Linex's efforts to

16   distort the well-understood meaning of "spread spectrum processing" with new extrinsic

17   evidence (which the Court need not even consider in light of the unambiguous disclosure of

18   the specification).

19        Moreover, as discussed at length in Dr. Acampora's declaration, each of the extrinsic

20   "spread spectrum" references Linex identifies (in particular those by Dr. Schilling) either

21   does, in fact, process data with a code, or is simply not a spread spectrum system at all.[7]

22   Acampora Decl. ¶¶ 47-69, 121-126, 143-146.

23   _____

24   [7] Linex also concludes (without citing the specification) that the disclosed embodiment
     "operates in a synchronized state," and therefore must transmit "synchronization codes" (*e.g.*,

25   pilot or training codes).  Linex suggests that these codes do not process data, and that this
     somehow proves that spread spectrum signals can be generated without processing data with

26   a code.  But the disclosed embodiment does not require synchronization symbols; on the
     contrary, a skilled artisan would understand the disclosed system ***not*** to use synchronization

27   symbols.  Acampora Decl. ¶¶ 17-21, 38-46.  In any event, such training or pilot signals (if

28

B.     "Code(s)"

Defendants' construction properly recognizes that the claimed "code" is "used to process data to *spread* the data's bandwidth."  The intrinsic evidence mandates this construction, which makes clear that *spreading* codes are the only type of claimed "code."  In contrast, Linex's proposed construction is contrary to the specification, the prosecution history, and extrinsic evidence.  In essence, Linex games the English language by taking a very broad word–"code"–and using it in ways never contemplated by the inventor.  *See Ariad Pharm., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (inventor must have "possession of the claimed subject matter as of the filing date.").

1.     **Defendants' Construction is Supported by the Specification.**

As the titles and abstracts of the reissue patents make clear, the inventions are directed to *spread spectrum* systems. *See* '219 and '812 titles ("Multiple-Input Multiple-Output (MIMO) *Spread Spectrum* System and Method") (emphasis added); Abstracts (describing invention as "[a] system and method for transmitting a plurality of *spread-spectrum* signals…").  Indeed, the term "spread spectrum" is mentioned in the specifications of the '812 and '219 *over 100 times*.  Moreover, the specification repeatedly explains how to "spread" and transmit data using a spreading code, and how to recover data from signals that have been previously spread.  For example, the Abstract explains that "matched filters" in receiver antennas are "matched to the chip-sequence signals of the plurality of *spread spectrum signals*" and that a "combiner" combines "a respective plurality of detected *spread-spectrum signals* and a respective multiplicity of detected-multipath-*spread spectrum signals*." '219 and '812 Abstracts.  The written description never once explains how to recover data from signals transmitted in any way other than with a spreading code.

Consistent with this focus on spread spectrum systems throughout the specification, the sole embodiments of the claimed "code"—*i.e.*, a code for "differentiating signals"—is a

they existed) would not be used to generate spread spectrum signals.  Acampora Decl. ¶¶ 33-37.

Defendants' Claim Construction Response and Summary Judgment Motion
Case No. 4:13-cv-00159-CW (MEJ)

code that is used to process data to **spread** the data's bandwidth and thereby generate a

spread spectrum signal.  *See* above citations ("code" corresponds to chip sequence generators

that generate spread spectrum signals); *see also* relevant claims (requiring "said signals being

differentiated by different codes conveyed along with said signals."); Acampora Decl. 133.

Moreover, in language that unambiguously defines the outer limits of the invention, the last

sentence of the written description makes clear that non-spreading codes were never

contemplated: "[I]t is intended that the **present invention** cover modifications and variations

of the efficient shadow reduction antenna system **for spread spectrum**…." '812 13:64-14:1

(emphasis added);'219 at 14:1-9 (same).  "When a patent thus describes the features of the

'present invention' as a whole, this description limits the scope of the invention."  *See*

*Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1308 (Fed. Cir. 2007).

### 2.    The Prosecution History Supports Defendants' Construction

Furthermore, Linex confirmed that a broader construction is untenable during

prosecution of the '219.  Linex amended the specification to read "[e]ach spread-spectrum

subchannel is defined by <u>the code represented by</u> a respective chip-sequence signal," and

explained to the PTO that the addition of "the code represented by" was "**inherent** in spread

spectrum processing."  Feb. 23, 2010 Resp. to Office Action at 2, 12 (emphasis added).

Linex argues this amendment clarifies that chip-sequence signal is merely an example of a

"code." Linex Br. 7.  But the amendment does not say it is an "example"; it says the code "is

represented by" a chip-sequence signal and Linex specifically told the examiner this code is

"inherent" in spread spectrum processing.  Linex could not have been more clear that it was

defining the term "code" to refer to a spread-spectrum code.

### 3.    Defendants' Construction is Consistent with Core Legal Principles.

It is well established that a claim term should not be read beyond the sole disclosed

embodiments where such a reading is contrary to "the written description['s] ... guidance as

to the meaning of the claims."  *SciMed Life Systems, Inc. v. Advanced Cardiovascular*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Systems, Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) (where catheters in the art were either coaxial or side-by-side, and specification discussed only coaxial catheter, this "lead[s] to the inescapable conclusion" that only coaxial catheter is claimed); *see also Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1018-1019 (Fed. Cir. 2009); *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1381, 1383 (Fed. Cir. 1999).  Here, the written description and prosecution history confirm that the claimed "codes" are only those that process data to spread the data's bandwidth.  This is a situation where the specification "consistently, and without exception" describes embodiments having characteristics that are critical to the invention.  *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1379 (Fed. Cir. 2006).  In such situations, patentees may not extend their monopoly to matter lacking those characteristics.  *Id.* (vacating construction broader than "overall context of … specification" permitted).

### 4.    **Linex's Arguments Lack Merit.**

Linex's arguments to the contrary merely reinforce the accuracy of Defendants' proposed construction.  Linex apparently agrees that the disclosed embodiments use spreading codes, Br. at 6, but argues that the claimed "codes" should nonetheless be read to encompass "non-spreading" codes.  However, the sole example of a non-spreading code that Linex purportedly identifies in the intrinsic evidence is actually a spreading code.  Specifically, Linex argues that the PTO supposedly acknowledged that the claimed "codes" need not spread by pointing to a "PN *spreader*" in the Sunay prior art reference.  But Linex is incorrect; it's called a "PN spreader" because it "spreads."  Acampora Decl. 78.[8]

---

[8] While ignoring the Texas court's construction of "spread spectrum signal" in the **same** patent and claim, Linex embraces the Federal Circuit's construction of the term "code" in a completely **different** patent.  Linex Br. 12 (citing *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1326 (Fed. Cir. 2012)).  *Interdigital* involved a different patent that used the term "code" substantially differently from the present patent, and is therefore not relevant here.  *Id.* at 1326 (finding patent specification used the term "code" to refer to non-spreading codes, patentee never disavowed a broader interpretation, and there was no persuasive justification for construing "code" to refer to spreading codes).

---

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Linex also suggests that the claims cover "codes" that "do not process data at all." Unable to find references to such codes in the specification, Linex resorts to conclusory arguments that "preambles," "pilots" or "training" sequences—are somehow implicitly disclosed, and calls them "codes," despite the absence of any reference to pilots, training, or preambles in the patents. *Supra* at 11 n.6.

Finally, ostensibly relying on the doctrine of claim differentiation, Linex argues that "code" cannot be so limited because (in response to the Texas Markman ruling), Linex added dependent claims reciting "spreading codes." The Court should reject Linex's litigation-driven effort to manufacture a claim differentiation argument by identifying the ***sole disclosed embodiment*** in the dependent claims. The presumption of claim differentiation does not permit an applicant to broaden a claim scope beyond what is supported by the written description. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011); *Tandon Corp. v. Int'l Trade Com'n*, 831 F.2d 1017, 1024 (Fed. Cir. 1987) ("Whether or not claims differ from each other, one cannot interpret a claim to be broader than what is contained in the specification and claims as filed.").[9]

### C. "Combining"

Defendant's construction recognizes that "combining" requires aggregating space ***and time-***diverse signals.[10] Linex again urges an overly simplistic construction ("aggregating") that attempts to broaden the claim language beyond what was disclosed, and even suggests (without any support) that "combining" need not even include aggregating ***space*** diverse signals. Linex's proposed construction is contrary to the intrinsic evidence, and to the Texas

---

[9] For the same reason, the Court should also reject Linex's argument that independent claims 97 and 109 in the '219 should be broadened to encompass non-spreading codes based on a comparison with other independent claims. Linex Br. 4; *Curtiss-Wright Flow Control Corp. v. Velan, Inc.,* 438 F.3d 1374, 1380 (Fed. Cir. 2006) (cautioning that applied to independent claims, "[c]laim differentiation is a guide, not a rigid rule.") (internal quotation omitted).

[10] Linex argues that this term does not need to be construed, yet proposed construing the same term in Claim 9 of the '322 in the Texas case.

---

14

court's construction of the same term:  "forming a single aggregated version of the received signal from the multiple versions of the transmitted *time and space diverse signals* received at the multiple receiver antennas."  The Texas court was right.

### 1.    Specification

The specification describes the combination process exclusively as involving *both* space *and time* diversity, with space diversity provided by the spacing of the receiver antennas, and time diversity provided by the RAKE devices.  The specification emphasizes that space *and time* combining is a key feature of the invention by repeatedly describing them as part of "the present invention."  '812, at 4:48-50 ("the present invention broadly includes an antenna system employing time (RAKE) and space (antenna) diversity."); *id.* at 2:8-13 ("According to the present invention… an antenna system is provided… for transmitting data… The transmitted signal passes through a communications channel having fading caused by *multipath*…"); '322 at 4:26-32..  Thus, while the specification might encompass different approaches for addressing time diversity and space diversity, "the present invention" must include both time and space diversity.  *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention"); *see also* Acampora Decl. 156-159.

Consistent with Linex's emphasis on the importance of time and space combining, *every* combiner in every figure discloses the use of a "RAKE *and* space combiner," and the specification consistently refers to RAKE (i.e., time) and space (antenna) diversity whenever it addresses "combining."  *See, e.g.,* '322 at 4:38-41 ("the *present invention* broadly includes an antenna system employing *time (RAKE) and space (antenna) diversity* and coding of spread spectrum signals"); *id.* at 2:53-58 ("plurality of RAKE and space-diversity combiners combine the plurality of detected spread-spectrum signals"); 3:49-52 ("RAKE and space-diversity combiner combines the detected spread-spectrum signal"); 9:42-46; 13:36-54.  In fact, each and every time "space-diversity combiner" appears in the specification, it appears

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

as "RAKE and space-diversity combiner." Moreover, as explained below, there can be no "combining" without first "separating," *see infra* at 18-19 ("combiner circuits"), and the specification confirms that "separating" requires separation of both "individually transmitted signals" (i.e., space-diverse signals) and their multi-path components. *See infra* 20-23 ("separating"). Linex incorrectly argues that the patent's disclosure of combining through "selection of the four strongest signals" does not require using time-diverse signals. Even in that case, "selection of the four strongest signals" requires the system to observe and store multiple time-offset versions of the same signals (*i.e.*, time-diverse signals) before the RAKE and space combiner can perform the selection. Acampora Decl. at ¶¶ 23, 97-103, 157.

### 2. Prosecution History

During prosecution, Linex disclaimed the construction it now seeks and confirmed that the inventor did not contemplate a broader invention. Linex distinguished two prior art references—Higashi and Ono—by arguing that the claimed combining process involves both time and space diversity combining, and in doing so confirmed the "present invention" includes both these features.

Linex argued that "[i]n Higashi et al, there is no teaching or suggestion of combining space diversity *and* time diversity." Amendment after Final at 14 (emphasis added). Linex elaborated that "[t]he *present invention* includes a plurality of receiver antennas, *and the combining of multipath signals*… the *present invention* has the advantage of providing space diversity *and* time diversity." *Id.* (emphasis added); *see Verizon,* 503 F.3d at 1308 (Fed. Cir. 2007). Similarly, Linex distinguished Ono because it did not disclose "a system, having space diversity *and* time diversity…." Dkt. 235-41 (Amendment D) at 188-189 (emphasis added). Therefore, the "combining" step in the patent claims must function to combine both the time and space diverse elements of the signal.

This prosecution history is applicable to the '219 and '812 claims as well. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003) ("[T]he prosecution of a parent application may limit the scope of a later application using the same claim term.")

(quoting *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1300 (Fed. Cir. 1999)).

Linex argues that the disclaimer for the '322 should not extend to the '219 or '812 claim

because (unlike the '322 claims) they do not include the term "multipath." The Court should

reject this argument. The '219 and '812 share the same specification as the '322, and the

asserted claims use the same term—"combining." As noted above, the shared specification

repeatedly and consistently describes combining of space ***and time*** diverse signals as a key

feature of the invention.

As the Texas court correctly concluded, Linex thus unambiguously disclaimed any

meaning for combining that does not include both space and time diversity. *See* Texas Order

at 30 ("Not only do the claims and specification disclose that both space and time-diversity

combining are required limitations, but [applicant] also made an affirmative representation to

the Patent Office… which limited the claimed invention to this embodiment."). Linex argues

that the claims of the '322 patent required "multipath," and that other claims do not. Linex

Br. at 17. But the Texas court found the specification and prosecution history so compelling

that it expressly declined to rely on the reference to "multipath" in Claim 9 of the '322. *See*

Dkt. 235-16 (Texas Order) at 28 n. 16 (declining to consider whether "multipath" in

preamble is a limitation because "the dispute is adequately resolved on other grounds").

Linex's litigation-driven actions, including during prosecution of the reissues, cannot erase

statements made during prosecution of the '322, or broaden the claims beyond what is

supported by the specification.

**D.      Combiner circuits/circuitry terms**

Defendants' construction acknowledges that the separating and combining limitations

work hand-in-hand; before the signals can be "combined," they must first be "separated." In

contrast, Linex's construction ignores that the claimed system can only combine previously-

separated signals. Linex cannot cite intrinsic evidence to support its construction, so it

resorts to twisting the claim language.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

In the specification, "combining" is *only* accomplished in combiners in conjunction with "matched filters" such as those depicted in Figure 3 for detecting and "separating" signals based on their spreading codes and time-offset signals. For example, the receiving antennas and matched filters in Figure 3 collectively "separate" to produce a total 16 spatial signals, one corresponding to each code/antenna combination, and then for each of these 16 signals, some number of versions that arrive at different times. The RAKE and space "combiners" then combine them in one of several different ways.

Consistent with this disclosure, the claim language makes clear that "separating" and "combining" work hand-in-hand. For example, claim 97 of the '219 recites that the "receiver circuitry" separates the signals at each receiver antenna "by detecting said different codes conveyed in said signals." Claim 97 then recites that the "combiner circuits" combine the "received data symbols transmitted in signals with the same code." Thus, Defendant's definition is consistent with the claims, in which signals sharing the same codes are first separated out from the received signals at each antenna, and then combined. As the inventor himself has acknowledged, if the signals were not first separated, the combiner circuits would not know which signals to combine. *See* ████████████████████████ ████████████████████████ Acampora Decl. ¶¶ 191-193.

As explained below for the "separating" term, *infra* at 20-23, the signals transmitted from each antenna, including the multipath components, must be separated. The relevant intrinsic evidence shows that data symbols in the separated signals that are recovered at the different antennas are combined. *See supra* at 15-18.

Linex argues that if "separated signals" in Defendants' construction means multipath versions of each signal that are separately detected at each antenna, then the claim requires combining *multipath* versions of the same signals. This just repeats Linex's arguments concerning "combining". *See supra* at 15-18. As explained above, the RAKE and space combiners use space diverse signals *and* time diverse signals to "combine".

**E.     "Despreading devices"**

18

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Defendants' proposed construction makes clear that: (1) each receiving antenna has a plurality of despreading devices, and (2) a plurality of multipath signals are detected for each of the first spread spectrum and second spread spectrum signals. Defendants' proposal stays true to the claim language and intrinsic evidence.[11]

The claim explicitly requires each receiving antenna to be associated with a plurality of despreading devices. *See* '322, Cl. 9. The claim recites "a plurality of despreading devices for detecting, ***at each receiver antenna*** of the plurality of receiver antennas..." The "detecting" is performed by the "plurality of despreading devices" that must exist "at each receiver antenna." Linex's proposed construction reads this language out of the claim.

The claim language also requires that the despreading devices at each receiver detect a plurality of multipath versions of each of the "first" and "second" spread spectrum signals. The claim states that "the plurality of spread-spectrum signals" passes "through a communications channel having multipath." This generates several multipath versions of the original signal. *See* '322, 5:50-58; '219, 5:56-64; '812, 5:57-65. The claim then recites that **each** receiver antenna "detects" the first and second spread-spectrum signals "as a first **plurality** of spread-spectrum signals, and a second **plurality** of spread spectrum signals . . . ." The "first plurality of spread-spectrum signals" received at a given receiver antenna can **only** refer to multipath versions of that transmitted signal. The same is true of the "second" plurality of signals. There is no other "plurality" of "first" or "second" signals "detected" at a given receiver. Linex's only response is to again suggest that the "plurality" of "first" signals (and "second" signals) can be detected at more than one receiver, rather than at "each" receiver as the claim recites. This is inconsistent with the claim language and the understanding of a person of skill in the art (*see* Acampora Decl. ¶¶ 162-169).

F.      "Separating"

---

[11] Linex argues this term need not be construed, yet proposed a construction for this term in the Texas litigation. Texas Order at 39.

The figures in the introduction above (*supra* at 4) demonstrate what separating means in the Patents-in-Suit.  Linex's proposed construction is wrong for at least two reasons.  First, Linex replaces "***separating*** the received signals into individual transmitted signals" with "***distinguishing*** the different signals"—an ambiguous term that has a different meaning.  There is no basis for this substitution, which suggests, contrary to the claim language and every disclosed embodiment, that there is no need to "separate" signals at all and that the composite received information can be used to determine what was transmitted.[12]

Second, Linex's proposal again ignores that addressing the effects of multipath (i.e., time-diversity) is fundamental to the invention.  The claim language, specification, and prosecution history all confirm that separation into multipath components is required.[13]

The asserted claims in the '219 and '812 vary from asserted claim 9 of the '322 in that they claim "separating" signals instead of "detecting" signals.  However, "detecting" in claim 9 of the '322 and "separating" in the '219 and '812 refer to the same function performed at the receiver.  *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006) (acknowledging that "claim drafters can also use different terms to define the exact same subject matter.").  As described above, a "matched filter" detects multiple multipath copies of spread spectrum signals that were spread with the "code" associated with that matched filter.  When the matched filter detects a code in the signal

---

[12] Neither Linex nor its expert disputes that "separating" requires, at minimum, separating into two the individually transmitted versions of the signal from the first antenna (one received at each receiving antenna), and the individually transmitted versions of the signal from the second antenna (one received at each receiving antenna).   *See* Acampora Decl. ¶ 174.   Linex's construction ignores this.

[13] Linex suggests that this term should carry the same "plain meaning" in each claim, while proposing different constructions for each claim.  Linex also argues that Defendants' construction is problematic because it uses the same construction for five different phrases.  However, Linex's sole rationale is that in two instances, the claim language recites "signal" while in the remaining instances, recites "spread spectrum signal."  But as explained above, *supra* at 11-14 ("codes"), a "signal" must be a "spread spectrum" signal in this context.  Defendants' construction is consistent with the language of every claim in which the term appears.

corresponding to the filter's code, the filter generates an impulse and thus "detects" that signal.  Acampora Decl. 18-19.  This act thereby **separates** the spread spectrum signals because the filter generates "impulses" only when individual signals are detected based on their respective spreading codes.  For example, the first matched filter detects the first spread-spectrum signals, and the second matched filter detects the second spread spectrum signals.  The first and second signals are thereby "separated" by the detection function.

The intrinsic and extrinsic evidence discussed above with respect to "despreading devices for detecting" is equally applicable here.  For the same reasons, the "separating" function separates signals into their multipath components.  *See supra* at 19-20.  Furthermore, the separated signals are then "combined," so the separating limitation must be read in conjunction with the combining limitations.  *See* ██████████████████████ ████████████████████████████████████████████████ *see supra* at 15-18 ("combining").  Therefore, Defendants' construction is further supported by the "combining" limitations of the '219 and the dependent claims of the '812.

During prosecution of the '812, Linex purported to rescind any disavowal during prosecution of the '322 of non-time (i.e., multipath) diversity.  But Linex has cited no authority for the proposition that it could rescind statements made during prosecution of an earlier patent.  *Otter Prods., LLC v. Treefrog Devels Inc.*, 2012 U.S. Dist. LEXIS 139253, 39 (D. Colo. Sept. 27, 2012) ("the court is not aware of any authority by which a patentee can rescind a disclaimer made in the prosecution of an earlier, issued patent in a subsequent prosecution with respect to the same claim term").  And regardless of any litigation-induced second thoughts, the statements still confirm the inventor did not contemplate a broader invention, and cannot be used to contradict the specification or to enlarge the scope of the invention.

Linex's remaining arguments should be rejected as well. Linex argues that the specification discloses an embodiment which selects the four strongest signals detected at the four receiver antennas, and suggests that this does not require separation into multipath

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

components.  '322, 9:65-10:2.  However, even in this embodiment, multipath components are separated for each of the transmitted signals at each antenna.  Acampora Decl. ¶¶ 177-181.  This "separating" of space and time diverse signals is performed at the matched filters, '322 at 8:21-10:58, so that all the signals can be provided to the combiners.

Linex also argues that Defendants' construction imports direct sequence spread spectrum from the specification by referring to "codes," and that it violates the doctrine of claim differentiation by suggesting those codes must "spread."  However, as noted above, the reference to spread spectrum "codes" is compelled by the specification.  *Supra* at 8-9, 11-13.

Finally, Linex argues that Defendants' definition is ambiguous because it acknowledges that the codes "conveyed in" the signals are "mixed with the data symbols."  Yet Linex itself informed the patent examiner that codes in the specification of the '219 were codes "inherent" in spread spectrum, and Linex cannot dispute that these inherent spreading codes (such as chip sequence signals) are "mixed with the data symbols."  Prucnal Decl. (Dkt. No. 235-1) at 17 (in the disclosed embodiment, "each spread spectrum device… multiplies the data in a subchannel by the chip-sequence signal").  The claimed "separation" occurs based on "detecting" codes "inherent" to spread spectrum, which are *always* mixed with data symbols.  Acampora Decl. ¶¶ 14-16, 27, 93-100.  Any other code would not be inherent, and therefore would be irrelevant to the claims.

## III. SUMMARY JUDGMENT OF NON-INFRINGEMENT

As set forth below and in the accompanying Acampora Declaration, Defendants are entitled to summary judgment of non-infringement.  In particular:  (1) under Defendants' construction of "codes" and "spread spectrum signal," no claim is infringed; (2) under any construction of "codes… conveyed along with" and "in," no claim of the '219 or '812 is infringed; and (3) under Defendants' construction of "separating" and "combining," no claim is infringed.  *See* Acampora Decl. ¶¶ 205-363 (no infringement, literally or under DOE).

### A. The Accused OFDM Products



**B.     Non-Infringement of the Accused Products**

Defendants' Claim Construction Response and Summary Judgment Motion
Case No. 4:13-cv-00159-CW (MEJ)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1.     **Under Defendants' Construction of "Codes" and "Spread Spectrum Signal," No Asserted Claim is Infringed**

Every asserted claim requires either "codes" or "spread spectrum signals" (or both). Defendants' construction of "codes" is "a predetermined sequence used to *process data* to *spread the data's bandwidth*," and Defendants' construction of "spread spectrum signal" is a "signal corresponding to data which has been processed with one or more *codes*."

a.     *The* ██████████████████ *Do Not "Process Data"*

Defendants' Claim Construction Response and Summary Judgment Motion
Case No. 4:13-cv-00159-CW (MEJ)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

b.    *The* ███████████████████ *Do Not Spread the* *"Data's" Bandwidth*

The P-matrix, HT-LTFs, and pilot signals cannot be the claimed "codes" because they do not spread the "data's" bandwidth, as required by Defendants' construction.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3

4

5

6

7

8

9

10

      2.      **Under Any Construction of "Codes… Conveyed <u>Along With</u>" and "<u>In</u>," No Asserted Claim of the '219 or '812 Patent is Infringed.**

The ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ cannot be the claimed "codes" under *any* construction because they are not "conveyed *along with* said signals" *and* "*in* said signals." *See* Claims 97, 108, 109, 120, 121, 132, 133, and 145 of '219; Claims 97, 101, and 106 of '812.   The claim language recites that the "signals" that the codes must be conveyed "with" and "in" are the signals that "convey[] *data*… in data symbols."   In other words, the codes must be conveyed "with" and "in" the data.

      The patents never use the word "convey" in the specification, but the specification shows how the "chip sequences" process and "convey" data by multiplying the data by a spreading code.   *See, e.g.*, '322 at 7:45-47.   The spreading codes are thus mixed in with the

---

14



data, and are transmitted both at the **same time** and **frequency** as the data-carrying signal. Acampora Decl. 188-189, 232-239. *See also* Prucnal Infringement ¶ 36.



As indicated above, the chip sequence modifies a +1 information bit in one way, and a -1 bit (or "0") in another way. *See* Acampora Decl. ¶ 14. Thus the transmitted and received chips are a blend of the chip sequence (spreading code) and the data, sent at the same time and in the same frequency. Acampora Decl. ¶¶ 188-189, 232-239.

Linex's expert **agrees** that training sequences sent separately from data are not codes conveyed "along with" and "in" data. **First**, Linex disputed that the prior art Marzetta patent discloses codes conveyed "along with" and "in" data signals, on the basis that the alleged codes in Marzetta are sent in a "training stage" that is separate from a second data stage. Prucnal Validity ¶¶ 702, 706; Acampora Decl. ¶¶ 187, 232.

**Second**, Linex's expert distinguished the prior art Paulraj patent, which discloses (just like 802.11) sending different "special" (training) signals to **continuously update** weights in a receiver to characterize the channel. Prucnal Validity ¶ 879. Linex's expert opined that these training signals are not "sent **with** signals carrying data" even though they are "transmitted at regular intervals from one transmitter at a time, **or from different transmitters simultaneously**." *Id.* ¶ 879; Acampora Decl. ¶¶ 371, 373-377, 389. Again, Linex's expert agrees that a code is not transmitted "with" and "in" a signal unless they share the same frequency **and** time space.

███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

3.    **Under Defendants' Construction of "Separating" and "Combining," No Asserted Claim is Infringed**

All of the asserted claims require "separating" and/or "combining" of received

signals. Under Defendants' proposed constructions, these claims require "time diversity":

the "separating" claims require "separating the received signals into the individual

transmitted signals ***and their multipath components*** …," and the "combining" claims require

"aggregating space- ***and time-diverse signals***."

As indicated above, the term "separating" is not used in the specification of the

patents, but its meaning (and how it should be applied) is clear from the patent – a receiver

antenna and circuitry must first separate multiple space signals and multiple time signals.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ███████████

4     Linex agrees that **time diversity** – also referred to as multipath diversity – relates to

5  receiving and using multiple time-offset components of a signal sent from a transmitter to a

6  receiver. ████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████

13  ███████████████████     For example, in a system configuration with just one transmitter

14  antenna and one receiver antenna, the receiver antenna can receive multiple time-offset

15  versions of a transmitted signal due to reflections of the transmitted signal as the signal

16  propagates to the receiver.  Acampora Decl. ¶¶ 101-103, 210; Acampora Non-Infringement ¶

17  50.

18     Linex further agrees that **spatial diversity** is different from time diversity.  Prucnal

19  Decl. ¶¶ 30, 83.  Spatial diversity relates to receiving multiple copies of the same signal at

20  different receiving antennas. ████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████

24  ████████████  Although different signals will inherently have different paths from a transmitter

25  to the multiple receiving antennas (and may arrive at different times) this is not the same as

26  time diversity.  *Id*. at ¶¶ 82-83.  "Time diverse" signals are the multiple time-delayed copies

27

28

of a signal originating from **one** transmitter antenna and separately arriving at **one** receiver antenna.

For example, in a configuration with two transmitter antennas (TAs), two receiver antennas (RAs), and no time diversity, the receiver receives four signals: each RA receives two signals, one from each TA.  Acampora Decl. ¶¶ 86-87; Ex. 4 (Acampora Non-Infringement) ¶¶ 119-121.  With time diversity, the receiver receives "N" multipath versions of **each** of the four signals, resulting in four (space) x N (time) signals.

The following figure depicts the difference between space and time diversity:



Defendants' Claim Construction Response and Summary Judgment Motion
Case No. 4:13-cv-00159-CW (MEJ)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

In short, Linex has made no showing that the receivers in the accused products can "separate" the multipath components of a received signal, or "combine" or select all or a subset of the signals that have been time-separated. *See, e.g.*, Acampora Decl. ¶¶ 257-259, 269-274; Acampora Non-Infringement ¶¶ 775-777.

## IV.    SUMMARY JUDGMENT OF INVALIDITY

As set forth below and in the accompanying Acampora Declaration, Defendants are entitled to summary judgment of invalidity of each of the asserted claims of the '219 and '822 patents based on U.S. Patent No. 5,345,599 ("Paulraj"), attached as Exhibit 6. *See generally* Acampora Decl. 367-390 & Appxs B & C thereto.

### A.    Paulraj Anticipates Each Asserted Claim of the '219 and '812 Patents

Under Linex's constructions and infringement theories, Paulraj anticipates each asserted claim. Linex's expert has only contested three elements of the asserted claims, each of which is satisfied under Linex's proposed constructions and infringement theory.

#### 1.    The '599 Paulraj Patent

Paulraj discloses multiple transmitter antennas and receiver antennas in a wireless transmission system. In particular, it discloses a "splitter" to demultiplex a "high bandwidth source signal (20) with a frequency bandwidth in excess of the channel bandwidth" into "d" subchannels, where d is the number of transmitting antennas, each having a bandwidth less than or equal to the channel's bandwidth (B). Ex. 6 (Paulraj) at 6:66-7:3; *see also* 10:45-52. The d signals are transmitted "in the same frequency channel" from separate transmitting antennas over a wireless channel that experiences multipath. The different transmitter antennas each transmit part of the data stream carried in the d signals. Prucnal Validity ¶ 878

(citing Paulraj at Figs. 2 and 40).  "[A]ll d signals" will be received by each receiving antenna.  Paulraj at 7:49-52; 9:33-40; Ex. 1 (Acampora Invalidity) ¶¶ 581 *et seq.*

Paulraj discloses that an "array characterizing data is directly (or indirectly) updated during signal reception…"  Paulraj at 9:66-10:2.  The characterizing data can be updated "by several means well known in [the] state of the art" including "a special signal [that] is transmitted at regular intervals . . . [or] different, but known, signal [] transmitted simultaneously from each tower . . ."  Paulraj at 10:7-20.  The use of "different, but known, signals" to update characterization data is an example of a "training sequence", which, as Paulraj states, was one of a number of well-known methods in the art for characterizing a communications channel.  Acampora Invalidity ¶ 584.

2. **Under Linex's Proposed Constructions and Infringement Theory, Paulraj Anticipates the Relevant Claims**

Defendants' expert report regarding invalidity explained in detail how Paulraj invalidates the asserted claims of the '812 and '219 patents.  In response, Linex only contests three claim elements: (1) "signals … from a single source," (Prucnal Validity ¶ 878); (2) "different codes conveyed along with said signals" (*Id*. ¶ 879); and (3) "spread spectrum signals."[16]  Under Linex's proposed construction and infringement theory, these limitations are disclosed by Paulraj.

***First***, Paulraj discloses "signals… from a single source."  Specifically, Paulraj discloses a broadcast studio 50 (Fig. 2) and a camera 18 (Fig. 3).  Linex's expert agrees that the data from this single source is transmitted by multiple transmitter antennas.  Prucnal Validity ¶ 878 (citing Paulraj at Figs. 2 and 4)  Paulraj further states that the disclosed system can be used in cellular systems, where transmissions would be sent using a single

---

[16] The first two elements are required by all asserted claims of the '219 and '812; the third is required by claims 121, 131-133, 144 and 145 of the '219, and claims 101-102 of the '812.  Linex's expert also disputes that Paulraj discloses multipath, *see* Acampora Decl. ¶¶ 367-371, but this is irrelevant because Linex's proposed construction does not require multipath or time-diversity.

source – *e.g.,* a cellular tower.  Linex's expert argues that there is no "single source" in

Paulraj because in the preferred embodiment, the antennas are spaced apart.  *Id.* However,

the asserted claims do not require the antennas to be close to one another.  Indeed, the

specification makes clear that "single source" refers to single ***data*** source, not a single

antenna location.  The specification and claims repeatedly refer to "demultiplexing" the

"single data source" into separate streams of data that are transmitted from different

transmitter antennas.  *See* '812 Figs 1, 2, and 5 (showing single data source "demultiplexed"

into multiple subchannels of data transmitted from multiple antennas); Cl. 97 of '812

(reciting "***demultiplexing*** said single data source"); ████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████        In any event, just as the Linex patents do not prescribe a maximum separation

between transmitter antennas, *see, e.g.*, '219 at 6:36-45, so too, consistent with its application

to cellular and mobile systems, nothing in the Paulraj invention specifies any minimum

separation.  Acampora Decl. ¶ 381-382.

    ***Second***, Paulraj discloses "different codes conveyed along with" the signals under

Linex's infringement theory.  Linex's expert does not dispute that Paulraj discloses the use of

"special" training sequences from different antennas.  Instead, he asserts that Paulraj "neither

teaches nor suggests that [i] the special signals are either different or [ii] are sent with signals

carrying data."  Prucnal Validity ¶ 879.  Assertion [i] is flatly contradicted by Paulraj, which

states:  "In another embodiment, **different, but known, signals are transmitted**

**simultaneously from each tower**." (10:7-20) (emphasis added).  *See* Acampora Decl. ¶ 375.

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

But the training signals in Paulraj are sent at least "adjacent to" the data,

Paulraj further discloses that in "tracking mode," characterizing data in the receiver is "updated *during signal reception*, and the spatial filters updated *continuously*." (Paulraj at 9:66-10:1 (emphasis added)).  Updating characterization information in the receiver based on the training signals can only occur "*during* signal reception" if training signals are sent at least "adjacent to" ("along with") data.   Acampora Decl. ¶ 376.

*Third*, Paulraj discloses "spread spectrum signals"

Defendants' Claim Construction Response and Summary Judgment Motion
Case No. 4:13-cv-00159-CW (MEJ)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3          For these reasons, it is undisputed that Paulraj discloses each of the three contested

4    claim limitations.  Paulraj therefore anticipates each of the identified claims.  In particular: as

5    to **'219 claim 97**, Linex only disputes that Paulraj discloses "signals" and "codes" (Prucnal

6    Validity ¶¶ 878-885); as to **'219 claims 107, 108, 109, 119, 120, 131-133, 144, and 145**,

7    Linex disputes that these claims are satisfied for the same reasons as for claim 97 (*Id.* ¶¶ 886-

8    891);**'812 claims 97 and  98** mirror the same claims in the '219 for which the only disputes

9    have been discussed above;[17] **'812 claim 106** is a dependent claim which further recites

10   "error correction" and "interleaving," and Linex's expert does not dispute that Paulraj

11   discloses "error coding" and admits that "interleaving" would have been obvious to add

12   because it was very well-known at the time of the invention (Acampora Invalidity ¶¶ 2067-

13   71; Acampora Decl. ¶ 390; Prucnal Validity ¶¶ 749, 913 (referring back to discussion of '219

14   claims, and admitting the interleaving was well-known); as to **'219 claim 121, and '812**

15   **claims 101-102**, Linex disputes only that Paulraj discloses "spread spectrum signals" and the

16   same limitations disputed with respect to claim 97.  *See generally* Acampora Decl. Appxs B

17   & C.

18

19

20

21

22

23

24

25

26

---

[17] Linex cross-references '322 claim 9, but the claim is actually the same as '219 claim 97.

27

28

DATED:  December 9, 2013

WILMER CUTLER PICKERING
HALE AND DORR LLP

By:    /s/ Jonathan W. Andron

Mark D. Selwyn (SBN 244180)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile:  (650) 858-6100

Elizabeth M. Reilly (Pro Hac Vice)
Dominic E. Massa (Pro Hac Vice)
Jonathan W. Andron (Pro Hac Vice)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile:  (617) 526-5000

Mark C. Scarsi (SBN 183926)
Jennifer L. Miremadi (SBN 245559)
Miguel Ruiz (SBN 240387)
Ashlee N. Lin (SBN 275267)
Michael Sheen (SBN 288284)
Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa, 30th Floor
Los Angeles, CA 90017
Telephone:  (213) 892-4000
Facsimile:  (213) 629-5063

*Attorneys for Defendant Apple Inc.*

COVINGTON & BURLING LLP

By:    /s/ Alan H. Blankenheimer
Robert T. Haslam (Bar No. 71134)
Deanna L. Kwong (Bar No. 233480)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Alan H. Blankenheimer (Bar No. 218713)
Laura E. Muschamp (Bar No. 228717)
Sara O'Connell (Bar No. 238328)
COVINGTON & BURLING LLP

9191 Towne Centre Drive, Suite 600
San Diego, CA 92122
Telephone: (858) 678-1800
Facsimile: (858) 678-1600

Alexander D. Chinoy (Pro Hac Vice)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*Attorneys for Defendant*
*Hewlett-Packard Company*

K&L GATES LLP

By:   /s/ David Shane Brun
Michael J. Bettinger (SBN 122196)
David Shane Brun (SBN 179079)
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8200
Facsimile: (415) 882-8220

*Attorneys for Defendant Aruba Networks, Inc.*

MORRISON & FOERSTER LLP

By:   /s/ L. Scott Oliver
L. Scott Oliver (CA SBN 174824)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792

*Attorneys for Defendant Meru Networks, Inc.*

LEWIS ROCA ROTHGERBER LLP

By:   /s/ Colby B. Springer
Colby B. Springer (SBN 214868)
LEWIS ROCA ROTHGERBER LLP
2440 W. El Camino Real, Sixth Floor
Mountain View, CA 94040
Telephone: (650) 391-1380
Facsimile: (650) 687-8492

W. Brent Rasmussen (*Pro Hac Vice*)

Defendants' Claim Construction Response and Summary Judgment Motion
Case No. 4:13-cv-00159-CW (MEJ)

Shane E. Olafson (*Pro Hac Vice*)
LEWIS ROCA ROTHGERBER LLP
40 N. Central Ave., Suite 1900
Phoenix, AZ 85004
Telephone: (602) 262-5327
Facsimile: (602) 734-3756

Jonathan W. Fountain (*Pro Hac Vice*)
LEWIS ROCA ROTHGERBER LLP
3993 Howard Hughes Pkwy., Suite 600
Las Vegas, NV 89169
Telephone: (702) 949-8230
Facsimile: (702) 949-8364

*Attorneys for Defendant Ruckus Wireless, Inc.*

**PROOF OF SERVICE**

On December 9, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following parties and counsel of record:

| | |
|---|---|
| *Counsel for Plaintiff Linex Technologies, Inc.* | Smith R. Brittingham , IV |
| | Vincent P. Kovalick |
| Robert F. McCauley | Barry W. Graham |
| Finnegan Henderson Farabow, Garrett and | Richard H. Smith |
| Dunner, LLP | Cecilia Sanabria |
| Stanford Research Park | Kenie Ho |
| 3300 Hillview Avenue | Rajeev Gupta |
| Palo Alto, CA 94304-1203 | Jia W. Lu |
| | Troy Edwin Grabow |
| | Finnegan Henderson Farabow, Garrett and |
| | Dunner, LLP |
| | 901 New York Avenue, NW |
| | Washington, DC 20001-4413 |
| | |
| *Counsel for Defendant Hewlett-Packard Company* | Alan H. Blankenheimer |
| | Laura E. Muschamp |
| | Sara O'Connell |
| Robert T. Haslam | Covington & Burling LLP |
| Deanna L. Kwong | 9191 Towne Centre Drive, Suite 600 |
| Covington & Burling LLP | San Diego, CA 92122 |
| 333 Twin Dolphin Drive, Suite 700 | |
| Redwood Shores, CA 94065 | Alexander D. Chinoy |
| | Covington & Burling LLP |
| | 1201 Pennsylvania Avenue, NW |
| | Washington, DC 20004-2401 |
| | |
| *Counsel for Defendant Aruba Networks, Inc.* | *Counsel for Defendant Meru Networks, Inc.* |
| | |
| Michael J. Bettinger | L. Scott Oliver |
| David Shane Brun | Morrison & Foerster LLP |
| K&L Gates LLP | 755 Page Mill Road |
| Four Embarcadero Center, Suite 1200 | Palo Alto, California 94304-1018 |
| San Francisco, CA 94111 | |
| | |
| *Counsel for Defendant Ruckus Wireless, Inc.* | W. Brent Rasmussen |
| | Shane E. Olafson |
| Colby B. Springer (SBN 214868) | Lewis Roca Rothgerber LLP |
| Lewis Roca Rothgerber LLP | 40 N. Central Ave., Suite 1900 |
| 2440 W. El Camino Real, Sixth Floor | Phoenix, AZ 85004 |
| Mountain View, CA 94040 | |
| | Jonathan W. Fountain (Pro Hac Vice) |
| | Lewis Roca Rothgerber LLP |
| | 3993 Howard Hughes Pkwy., Suite 600 |
| | Las Vegas, NV 89169 |

/s/   Jonathan W. Andron
Jonathan W. Andron

39